Ralph STELL, by Next Friend,
et al., Plaintiffs,

United States of America,
Plaintiff–Intervenor,

v.

The BOARD OF PUBLIC EDUCATION
FOR the CITY OF SAVANNAH and
The County of Chatham, Defendants,

Darnell Brawner, John K. McGinty,
et al., Defendants.

Civ. A. No. 1316.

United States District Court,
S.D. Georgia,
Savannah Division.

Aug. 12, 1994.

Franz R. Marshall, U.S. Dept. of Justice,
Civ. Rights Div., Washington, DC, Dennis D.
Parker, NAACP Legal Defense Fund, New

York City, Bonzo C. Reddick, Savannah, GA, for plaintiffs.

Alfred A. Lindseth, Sutherland, Asbill & Brennan, Atlanta, GA, Leamon R. Holliday, Roy E. Paul, Savannah, GA, for defendants.

## *ORDER*

EDENFIELD, Chief Judge.

Following the failure of numerous school desegregation plans in the 1970s to effectively desegregate the schools in the Savannah–Chatham County School District, in 1985, this Court ordered the Defendant School Board to submit a revised desegregation plan "so as to bring an end, once and for all, to the dual system of education that continue[d] in [the] school system." Order of June 14, 1985. After the submission of several plans, a failed bond issue, and extensive negotiation among the parties, the Court issued an Order on June 3, 1988, approving the School Board's plan and ordering its immediate implementation.

At this time, the 1988 Plan has spanned six years. Twenty-three years have elapsed since the initiation of federal court supervision, and thirty-two years since the suit's inception. Asserting that it has implemented the 1988 Plan in its entirety and has demonstrated an unwavering commitment to desegregation with good faith, the Defendant School Board now moves the Court to declare the system unitary under the law and to thereby withdraw judicial supervision of the District. After permitting the parties full discovery, the Court held an evidentiary hearing regarding the Defendant's motion on May 10–11, 1994.

After careful consideration of the record, the testimony adduced at the hearing, and the applicable law regarding attainment of unitary status, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT[1]

### I. Background

#### A. *Early History*

The genesis of this case reaches back to 1962, when several black parents filed a complaint to compel the Defendant School Board to desegregate the system's schools pursuant to *Brown v. Board of Educ. of Topeka,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("Brown I"). Subsequently, the United States intervened in the litigation.

The schools remained segregated for several years after the case was filed. During the mid-to-late 1960s, "freedom of choice" plans were implemented, and a small number of black children attended historically white schools under these plans.

In 1968, the Supreme Court held in *Green v. County School Bd. of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), that freedom of choice plans, where ineffective, failed to satisfy school systems' constitutional duties to desegregate, and therefore other methods of desegregation, such as zoning, must be pursued. Following the Supreme Court's decision, the School Board proposed a plan premised on geographic attendance zones. The United States Department of Health Education and Welfare ("HEW") objected to the School Board's plan and submitted an alternative plan. On July 18, 1970, District Judge Alexander A. Lawrence approved portions of HEW's plan, comprising zone changes, several elementary school pairings, and a majority-to-minority transfer program. The plan was implemented for the 1970–1971 school year and resulted in significant desegregation at several elementary schools. However, many schools remained largely segregated.

In 1971, the Supreme Court held in *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), that assignment and transportation or "busing" of students to schools in non-contiguous zones was a permissible, and, in some in-

---

1. To the extent that the Court issues findings of fact that constitute conclusions of law, the Court adopts them as such. Similarly, any conclusions of law that may be construed as findings of fact are adopted as such.

stances, necessary desegregation remedy. Taking the initiative following *Swann,* the School Board filed a motion to revise the 1970 plan, proposing a number of measures for desegregating the district's high schools and middle schools. These measures included non-contiguous attendance zones and busing of black students to predominantly white schools. The Board requested that the submission of a complete desegregation plan for the elementary schools be delayed until November 1972.

The District Court, with minor exceptions, approved the School Board's plan. However, on August 23, 1971, the Court of Appeals for the Fifth Circuit reversed that part of the order which permitted desegregation of the elementary schools to be deferred until the following school year. Accordingly, on August 31, 1971, the District Court ordered the implementation of a plan encompassing schools at all grade levels and providing for the pairing and clustering of all-black and all-white schools, mandatory assignment, and extensive busing (hereinafter the "1971 pairing plan").

Without delay, the School Board implemented the 1971 pairing plan. As observed by this Court in a previous Order, the School Board "went well beyond the minimum constitutional requirements" in executing the plan, and achieved "immediate and striking" results.[2] Every school in the district, save one, was racially balanced.

These positive results, however, did not endure. Following the institution of the 1971 plan, the school system quickly lost a predominantly white and middle class population of approximately 10,000 children to private and other area schools. During the first year, approximately forty-two percent of all white students assigned to a black receiving school failed to enroll in the school to which they had been mandatorily assigned. This "white flight" continued over the years as the school district, which had been a majority white district prior to the 1971 plan, became predominantly black.

Concluding that the mandatory plan had failed to eliminate the vestiges of the prior dual system, this Court directed the School Board in 1985 to advance another plan. Order of June 14, 1985. In response, the School Board submitted a comprehensive long range plan to desegregate the school system by closing certain schools, building new facilities and converting some existing facilities, developing magnet schools and programs, redrawing attendance zones, and restructuring grade configurations. The Court approved the plan, and a consent decree was entered on January 5, 1987.

The implementation of the long range plan, however, was contingent upon approval by the voters of Chatham County of a bond issue necessary to finance the extensive new construction and renovations, as well as other expenditures under the plan. Unfortunately, the voters soundly rejected the bond referendum by a margin of greater than two-to-one. Following this discouraging defeat, the Court directed the School Board to devise a new plan that would not depend upon a bond issue.

### B. *The 1988 Plan*

In March 1988, the School Board submitted a revised plan. The stated goal of the School Board's 1988 Plan was to achieve the "maximum practicable degree of actual desegregation in the public schools of Savannah and Chatham County." *Stell,* 724 F.Supp. at 1401. For purposes of the Plan, the School Board set forth, and the Court adopted, the definition of a desegregated school as being one which has a racial composition within twenty percentage points above or below the system-wide student ratio at the grade level served by that school. *Id.* Consequently, the School Board's 1988 Plan focused primarily upon the district's elementary schools; most of the middle and high schools met the above criterion.

In order to accomplish its objectives, the School Board abandoned pairing and mandatory reassignment, the primary desegregation tools of the 1971 pairing plan. Instead,

---

**2.** Indeed, the Court noted that it was "hard to imagine a more sweeping and comprehensive busing plan for desegregation." Order of June 3, 1988. *Stell v. Board of Public Educ. for City of Savannah and County of Chatham,* 724 F.Supp. 1384, 1386 n. 2 (S.D.Ga.1988).

the key elements of the 1988 Plan were (1) revised attendance zones designed to maximize desegregation through emphasis on a neighborhood school assignment plan, (2) magnet programs at eleven predominantly black inner city schools, and (3) a majority-to-minority transfer option to desegregate predominantly white schools.

The heart of the Board's plan lay in the magnet concept. A magnet is an educational program which, in addition to a basic curriculum, offers an additional highly specialized curriculum centered on a theme. Such a program is designed to meet the needs of children as well as providing an added attraction to draw students from around the school district. The 1988 Plan provided for the institution of these magnet programs in predominantly black schools along with traditional educational courses, with each magnet program enrolling fifty percent white and fifty percent black students. Because of the residential patterns in the district, the non-magnet programs would be comprised predominantly of black students.

Another important facet of the Plan was the majority-to-minority ("M-to-M") transfer program, which afforded a student in the majority race in his or her school the opportunity to transfer to a school in which he or she would be in the minority. Such transfers were to be entirely voluntary, and free transportation would be provided.

Additionally, the 1988 Plan called for the construction of two new elementary schools in predominantly black residential areas of downtown Savannah, and for substantial renovations to be made at other predominantly black schools housing magnet programs. Further, eight elementary schools were designated for closure by 1991–1992 because they were outmoded or impractical for use in the desegregation plan due to small capacity, location, or size limitations restricting expansion or portable classrooms.

After a full evidentiary hearing in April 1988, the Court adopted the School Board's plan in an order entered on June 3, 1988.[3] The 1988 Plan was implemented beginning in the fall of 1988, and was subsequently approved by the Eleventh Circuit.[4] *Stell v. Savannah–Chatham County Bd. of Educ.*, 888 F.2d 82 (11th Cir.1989).

## II. Implementation of 1988 Plan

It is uncontroverted that the School Board has fully implemented all of the essential components of the 1988 plan. (Tr. 15, 71, 154.) More precisely, beginning in 1988, new elementary attendance zones were drawn and implemented.[5] Additionally, in 1988, a revitalized M-to-M program was instituted. (Def.'s Ex. 6.)

With regard to magnet programs, the 1988 Plan specified magnet programs at eleven predominantly black inner city schools— eight elementary schools, one middle school, and two high schools.[6] Programs at two schools, Hodge and Gadsden Elementary schools, had opened in the fall of 1987, prior to the 1988 Plan. In the fall of 1988, four additional magnet programs at elementary schools were implemented. Since that date, the school system has established six other magnet programs at the elementary level, for a total of twelve magnets at elementary schools.

---

**3.** The School Board was not alone in submitting a desegregation plan. The Plaintiffs submitted to the Court an alternative plan substantially similar to the School Board's plan, except that it required dedicated magnet schools, where the entire school would be devoted to magnet programs. The Justice Department offered no plan. *See, Stell*, 724 F.Supp. at 1384.

**4.** Additionally, during the pendency of the appeal, the School Board and the United States entered into a stipulation which provided for certain degrees of interaction between students in magnet program classes and those students in regular classes. (Def.'s Ex. 28.) In its opinion, the Court of Appeals took note of the stipulation

and ordered it implemented. *Stell*, 888 F.2d at 86.

**5.** After 1988, the School Board proposed several modifications to attendance zones, which the Court approved. These changes were made to improve desegregation in the schools and were all reviewed and consented to by the United States and Plaintiffs. (Def.'s Ex. 1.)

**6.** The schools designated for magnets were: Bartow Elementary, East Broad Elementary, Ellis Elementary, Gadsden Elementary, Garrison Elementary, Haven Elementary, Hodge Elementary, May Howard Elementary, Hubert Middle School, Beach High School, and Savannah High School.

Additionally, in responding to community interest in continuing magnet themes beyond the elementary level, the school system has established seven magnets in the middle and high schools, in addition to the three specified in the Plan, for a total of five magnet programs at the middle schools, and five magnet programs at the high school level.[7]

The Court here observes that, in founding a total of 22 magnet programs housed at 20 different schools, including twelve additional magnet programs not specified in the desegregation plan,[8] the school system has not only complied with the decree, but has gone well beyond the dictates of the 1988 Plan in an effort to promote desegregation. Further, in 1992, the School Board, upon its own initiative, adopted new eligibility requirements for students transferring to the magnet programs, in an effort to alleviate any segregative impact at schools sending children to magnet programs.[9]

Moreover, as readily acknowledged by the United States and the Plaintiffs, the school system has also fulfilled its obligations under the 1988 Plan with regard to school closures, new construction, and facilities improvement.[10] Since 1988, the school system has closed eight schools, all of which were deemed obsolete or difficult to desegregate: Barnard Elementary, Herty Elementary, Pearl Smith Elementary, Pennsylvania Avenue Elementary, Port Wentworth Elementary, Riley Elementary, Thirty–Eighth Street Elementary, and Tybee Elementary. (Def.'s Ex. 24; Govt's Ex. 2 at IV–3.)

Additionally, pursuant to the Plan, the school system has constructed two new elementary schools in downtown Savannah, Garrison Elementary and East Broad Elementary, and has established magnets in both schools.[11] (Def.'s Ex. 15, 24.)

Finally, there is no dispute that the School Board has complied with all of the reporting requirements set out in the Court's June 3, 1988 order. *See, Stell,* 724 F.Supp. at 1405–1406 (establishing detailed reporting requirements).

Hence, it is manifest that, from the impetus of the 1988 Plan, the School System has devoted tremendous effort to achieving the goals set forth in the Plan. Indeed, even the United States and the Plaintiffs applauded the District's commitment. The United States observed that the School Board had made "a vigorous effort to implement the desegregation [plan]," including "extensive efforts to recruit parents and students into

---

7. The magnet programs are as follows: Bartow Elementary (gifted & talented); Bloomingdale Elementary (performing/fine arts); Butler Elementary (writing/communications); East Broad Elementary (computer science/video technology); Ellis Elementary (Montessori magnet); Gadsden Elementary (performing/fine arts); Garrison Elementary (biological sciences); Haven Elementary (sciences/mathematics/engineering); Hodge Elementary (computer science); Pooler Elementary (computer science); J.G. Smith Elementary (traditional); Spencer Elementary (honors, international studies/foreign language); DeRenne Middle (honors); Hubert Middle (computer science); Mercer Middle (writing and mathematics); Shuman Middle (performing arts and communications); Tompkins Middle (computer science); Beach High (biological/medical professions and military sciences/aviation); Jenkins High (engineering/robotics); and Savannah High (business/legal/financial and arts). (Def.'s Ex. 4.)

8. Proposals for the twelve additional magnets not specified in the original 1988 plan were submitted to and approved by this Court. (Def.'s Ex. 1.)

9. For a complete description of these eligibility requirements, see Defendant's Exhibit 29.

10. In his report, the United States' expert specifically noted:

[T]he school system has met its obligations for construction and closing of schools as specifically called for in the 1988 Plan as amended.

\* \* \* \* \* \*

[W]e conclude that the school system has largely fulfilled the facilities improvement promises set out in its semi-annual reports, or it has that work scheduled and funded under the 1994 bond issue.

\* \* \* \* \* \*

[I]t is reasonable to conclude that the System has gone beyond the bare requirements of the 1988 Plan and the State Five Year Plan to renovate schools and to begin dealing with long delayed maintenance that led to deteriorated facilities in some cases.

(Govt.'s Ex. 2 at IV–2, IV–4, IV–10.)

11. To meet enrollment needs, the school system has also built two other elementary schools since 1988: Islands Elementary in 1992, and Georgetown Elementary in 1993. In deciding upon attendance zones for these schools, the Board ensured that they would be racially integrated, and both opened well within the ±20% guideline set forth in the Plan. (Def.'s Ex. 24.)

the voluntary desegregation programs."[12] (Govt.'s Proposed Findings of Fact and Conclusions of·Law at 16.) Similarly, Plaintiffs' counsel acknowledged that there had been "major changes," and in no way questioned the District's good faith or initiative in implementing the Plan. (Tr. 321–322.)

All of the above measures have not come, however, without great expense to the citizens of Savannah and Chatham County. Indeed, from 1988 through the end of 1992, the school system spent a staggering·$57.6 million on desegregation.[13] Further, of that amount, the school system has committed $49.1 million in local funds. Undaunted by the earlier failure of the 1987 bond referendum, the School Board appealed to the voters of Chatham County in 1990, and again in 1994, vigorously promoting bond issues for. school system needs, including desegrega-

tion. To its credit, both measures met with impressive success; the 1990 issue passed by a margin of approximately two-to-one, and the 1994 referendum passed with more than 80 percent voter approval. (Tr. 25.)

Therefore, having determined that the School Board has fully implemented the 1988 Plan in good faith, the Court now turns to examine the actual results of the Board's endeavors, and the effectiveness of that Plan.

### III. Effectiveness of Desegregation Measures Under The 1988 Plan

■ The fundamental issue before the Court is whether the desegregation measures taken by the School Board have been effective in eliminating, *to the extent practicable*,. the vestiges of the former dual school system. *Green*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Board of Educ. of Oklahoma City v. Dowell*, 498 U.S. 237, 111 S.Ct.

---

12. Dr. Geri Smith, the district's Assistant Superintendent, and staff person responsible for desegregation programs, testified in detail as to the system's immense recruitment efforts. She testified that letters are mailed to all parents informing them of the various options available through the magnet programs. In addition, the District hosts a public school "open house" or "extravaganza" at the Savannah Civic Center each year. At this event, teachers and faculty staff booths for each magnet program, thus providing parents and students an opportunity to inquire and learn about program offerings. The district also advertises both in the print media and on television. In other initiatives, the district targets public libraries and day care centers; for instance, in February 1994, a school representative visited approximately 25 day care centers in the surrounding area to promote the district's magnet schools. Lastly, with federal monies, the district has employed a "Magnet Recruitment Specialist," responsible for working with schools having difficulty obtaining a racial balance within $\pm 20$ percent of the district-wide ratio. (Tr. at 56–57.)

13. The particulars of the desegregation costs, from 1988 through fiscal year 1992, are as follows:

Programmatic Costs

| | | |
|---|---|---|
| A. | Magnet Programs | $15.5 million |
| B. | Select Programs | $ 1.9 million |

Transportation (M–to–M and Magnet)      $ 4.3 million*

Capital Costs

| | | |
|---|---|---|
| A. | Direct magnet facilities | $ 7.4 million |
| B. | Other improvements to magnet schools | $ 7.9 million |
| C. | New schools (East Broad and Garrison) | $19.4 million |

Administrative Costs      $ 1.1 million

TOTAL      $57.6 million

Funding Sources:

| | |
|---|---|
| Local | $49.1 million |
| State | $ 5.1 million |
| Federal | $ 3.4 million |

(Def.'s Ex. 9.)

* The Court observes that, in order to meet the extensive busing needs required by the voluntary magnet and M-to-M student transfers, the school system more than doubled its school buses, increasing its total number of buses from 115 to 268. Order of August 27, 1993, at 27 n. 16.

630, 112 L.Ed.2d 715 (1991); *Freeman v. Pitts*, 503 U.S. ——, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). In confronting this issue, courts traditionally scrutinize various aspects first iterated by the Supreme Court in *Green*: student assignments, faculty, staff, facilities and resources, transportation, and extra-curricular activities. *Green*, 391 U.S. at 435, 88 S.Ct. at 1692.

In this case, the foremost area of contention is that of student assignments. The Court therefore analyzes first the Plan's impact on student assignments—the focus of the unitary status hearing—before addressing the remaining *Green* factors.

### A. *Student Assignments*

#### 1. *Racial Balances Prior to 1988 Plan*

In order to better evaluate recent desegregation efforts, the Court must briefly address their historical context. In 1968, prior to the advent of any substantive desegregation measures, approximately 41,910 students were enrolled in the Savannah–Chatham County School System. Of that number, 59 percent of the students were white and 41 percent were black. By the 1972 school year, just one year after the institution of the mandatory pairing plan, approximately 8,000 white students had left the system. Further, of the 34,236 students enrolled in 1972, 49 percent were white and 51 percent were black. (Def.'s Ex. 24.) Hence, what was, prior to 1971, a majority white district became predominantly black.

By 1987, because of continued "white flight," the statistics revealed a racial composition that was a virtual mirror opposite of that existing before 1971. In 1987, approximately 31,685 students were enrolled in the system; of those, 59 percent were black, and 41 percent were white, the exact reverse of percentages existing in 1968. (Def.'s Ex. 24.)

During the 1986–1987 school year, prior to the implementation of the 1988 Plan, 14 elementary schools out of a total of 33 deviated more than 20 percent from the district average at that grade level, which was approximately 41 percent white. (Govt.'s Ex. 3.) Of these 14 schools, five were predominantly white: Bloomingdale, 79 percent; Gould, 66 percent; Howard, 70 percent; Pooler, 87 percent; and Tybee, 95 percent. Nine elementary schools were predominantly black: Barnard, 99 percent; Ellis, 88 percent; Gadsden, 81 percent; Haven, 87 percent; Herty, 86 percent; Pearl Smith, 96 percent; Riley, 89 percent; Thirty–Eighth Street, 100 percent; and Spencer, 94 percent. (Govt.'s Ex. 3.)

At the middle school level, out of eight schools, two deviated more than twenty percentage points from the district-wide average of 41 percent white: one, Mercer, was 65 percent white, and another, Hubert, was 97 percent black. (Govt.'s Ex. 3.)

At the high school level, out of seven high schools, two varied more than twenty percentage points from the district-wide average of 58 percent black and 42 percent white at that grade level. Specifically, Savannah High had an enrollment that was 84 percent black, and 16 percent white; Beach High was 79 percent black and 21 percent white. (Govt.'s Ex. 3.)

As these figures disclose, in the 1986–1987 school year, out of 52 schools in the District, 18 schools deviated more than 20 percentage points from the district-wide ratio. (Def.'s Ex. 24.) Moreover, of these 18 schools, 5 were more than 90 percent black—Barnard Elementary, Pearl Smith Elementary, Thirty–Eighth Street Elementary, Spencer Elementary, and Hubert Middle—and one school, Tybee Elementary, was more than 90 percent white. (Def.'s Ex. 24.)

#### 2. *Results of 1988 Plan and Overall Trends*

Since 1988, the School District's goal has been to attract large numbers of black students to otherwise predominantly white schools under the M–to–M program and white students to otherwise predominantly black schools under its various magnet programs, and to thereby integrate both historically black and white schools. The School System has substantially accomplished these goals.

Evidence introduced at the hearing showed that, since the magnet programs were implemented, student participation in the program

has escalated from 561 students in the 1987–1988 school year to 4,728 students during the 1993–1994 school year. (Def.'s Exs. 5, 6, 7.) Furthermore, testimony and evidence presented by both the School System and the United States revealed that the School District has achieved 99 percent of the targeted overall magnet enrollment established under the Plan.[14]

The M–to–M program has met with similar success. The total number of children transferring to schools other than their neighborhood school under the M–to–M program has grown from 210 students in 1987 to a total of 1615 in 1993. (Def.'s Exs. 5, 6, 7.) Under the Plan, the System projected or targeted transfers of 1,145 black students to otherwise predominantly white elementary schools under this program. In actuality, the program attracted 1,254 black elementary students in 1993, thus achieving 110 percent of the projected enrollment and surpassing the System's goals. (Tr. 132.) (Def.'s Ex. 27.)

14. Specifically, in 1988, the system established a target magnet enrollment of 4866 students. In 1990, under approved Plan modifications, the projections for the original eleven magnets were reduced by 150 students, to 4715. Actual enrollment in the magnet programs in 1993, minus that at Mercer Middle for which there existed no target magnet figure, was 4679 students. Therefore, with a revised target enrollment of 4715 and actual enrollment of 4679, the System achieved 99 percent of its goal. (Tr. 276–279.) (Govt. Ex. 4, 5.)

15. As the Court recognized in 1988, Dr. Armor, a former Principal Deputy Assistant Secretary of Defense, possesses extensive credentials and vast experience in the area of school desegregation and has published widely on the subject. (See also Def.'s Ex. 10.)

16. The first study focused upon the percentages of both black and white students in the District attending racially balanced schools from 1968 to 1993. (Def.'s Ex. 11.) (Tr. 95–98.) The statistics disclosed, not surprisingly, that in 1968, only about 5 percent of both black and white students in the District attended racially balanced schools, that is, schools whose enrollments fell within ±20 percentage points of the district-wide ratio at that grade level. In 1971, with the commencement of the mandatory pairing plan, these numbers increased precipitously. Indeed, in 1971, 85 percent of black students and 91 percent of white students attended racially balanced schools. After 1971, however, these percentages abruptly declined with the advent of "white flight" from the System. Thus, by 1986, shortly

To further evaluate the success of the 1988 Plan in desegregating student assignments, the School District called upon Dr. David J. Armor, presently a Senior Fellow at the Institute for Public Policy at George Mason University.[15] As previously noted by the Court, Dr. Armor played an instrumental role in the design of the 1988 Plan, and his expertise was greatly relied upon by the Court in its decision approving the Plan. At the unitary status hearing, Dr. Armor testified that he had also participated in planning and formulating various improvements to the 1988 Plan, and thus had closely monitored the Plan during the course of its implementation.

Relying upon various overall desegregation trends in the District, Dr. Armor opined that the 1988 Plan had been highly successful in desegregating the School District. In support of his conclusions, Dr. Armor referred to three different studies analyzing desegregation trends.[16] These studies revealed that before the voluntary Plan's implementation, only 41 percent of black students and 73 percent of white students went to schools that were racially balanced. Beginning in 1987, however, with the institution of the first magnet programs, these numbers edged steadily upward; by 1992, 76 percent of black students attended schools that were racially balanced, compared with 82 percent of white students.

As noted by Dr. Armor, these figures reveal enormous improvement in the racial balances in schools across the District. Further, and extremely salient, was Dr. Armor's observation, that, unlike the period following the 1971 mandatory plan, the period since 1989 has shown extremely *stable* racial balances. Indeed, *consistently* since 1989, more than 70 percent of black students and 73 percent of white students have attended racially balanced schools, with no indication of any significant decline.

Dr. Armor pointed to two additional common desegregation indicators, which, while not as dramatic as the above, also verified his conclusions. The first was a measure known as the "index of dissimilarity," commonly used by experts in school desegregation to measure the degree of segregation or desegregation in a school district. (Def.'s Ex. 12.) As explained by Dr. Armor, the number values of the index "roughly correspond[] with the percentage of students that would have to be bused and changed from one school to another to achieve perfect racial balance." (Tr. 99.) Accordingly, a value of 100 denotes a completely segregated system, while a value of 0 denotes a system with

there has been a marked increase in the percentage of black students attending racially balanced schools since the Plan's implementation. Indeed, in 1986, only 41 percent of black students in the District attended schools that were racially balanced; however, by 1992, 76 percent of black students attended racially balanced schools—almost as high a percentage as that reached in 1971, the first year of the mandatory pairing plan, when 85 percent of black students attended racially balanced schools. Based upon this figure and other data, Dr. Armor stated that, presently, more students attend racially balanced schools than at any other time since the initial implementation of the 1971 plan, and that there exists a high degree of racial balance in the District.

Therefore, based on overall trends, Dr. Armor confidently surmised that the 1988 Plan had been highly successful in arresting segregative forces caused by demographics, and had achieved substantial desegregation in the District. Furthermore, Dr. Armor found that, not only had the Plan been extremely successful, but also *more effective* than the original [1971 pairing] plan in attaining *long-term, stable desegregation* over almost a seven-year period, unlike the ephemeral success of the earlier plan. (Tr. 106.)

Dr. Armor's conclusions went unchallenged. Neither Plaintiffs nor the United States questioned Dr. Armor's methods, credibility, or findings, and neither party offered testimony contravening his conclusions.

### 3. Racial Balances at Individual Schools

While the Plaintiffs and the United States did not contest the dramatic overall success of the Plan, they argued that, because several schools do not meet the $\pm 20$ percent goal established in 1988, the Court should find that vestiges of the dual system remain, and

perfect racial balance in every school. In 1968, the index stood at 94 for elementary schools and at 87 for secondary schools, revealing an extremely high degree of racial imbalance. In 1971, with the pairing plan, the numbers plummeted to 21 for elementary schools and 14 for secondary schools. By 1987, however, the index had climbed to 40 for elementary schools and 33 for secondary schools. In 1993, after the full implementation of the Plan, the elementary school index had dropped 7 points, from 40 to 33, and the secondary school index decreased 8 points, from 33 to 25. (Def.'s Ex. 12.)

In commenting upon this index, Dr. Armor testified, first, that these numbers showed a marked improvement in racial balance with the implementation of the Plan, and, secondly, reflected "a high degree of racial balance" or "a low degree of imbalance" in the System. (Tr. 100.) Dr. Armor also noted that the index confirmed that "the plan has been effective and ... has reversed the trend of increasing imbalance that was happening in the 1980s before the new plan was put into place." (Tr. 100.)

Finally, Dr. Armor discussed a third indicator relied upon by desegregation experts to assess desegregation measures. This indicator, labeled the "interracial exposure index". elucidates the absolute level of exposure of children to children of different races. Specifically, the index indicates the average percent of white children in the average black child's school. (Def.'s Ex. 13, 14.) The highest value the index may attain is the average percent of white students in the District.

In 1968, the elementary school index registered at approximately 5, in contrast with its highest possible level of 57, the percentage of white students in the District at that time. Hence, a 52–point gap existed, showing the impact of segregation on the System. In 1971, following the pairing plan, the figures converged. That is, the index value was 42, in comparison with 46 percent white students in the district, thus leaving only a 4–point differential. By 1986, the numbers had moved apart, showing resegregation since 1971: the index value stood at 31, in comparison with a maximum value of 40, showing a 9–point differential. By 1993, the figures had again converged; the index value was 34, compared with a maximum achievable value of 39. Hence, with a 5–point differential in 1993, the exposure index indicated racial balance almost as successful as that in 1971, in which there existed a 4–point differential. (Def.'s Ex. 13.) Dr. Armor testified that the index revealed "that the new plan reversed some adverse trends, improved desegregation, and in fact, has desegregated just about as much as the '70's plans when we take our percent white into account." (Tr. 104.)

The results at the secondary level evidenced a similar pattern. (Def.'s Ex. 14.) Specifically, in 1968, a 50–point differential existed, with the index at 12, and the percentage of white students in the System at 62. In 1971, that gap closed to 3 points, with the index at 48, and 51 percent white students in the District. By 1986, a 6–point margin existed, with an index value of 36, and 42 percent white students in the District. With the execution of the 1988 Plan, however, the margin narrowed to two points, as the index value by 1993 stood at 34 and the percentage of white secondary students at 36.

thus deny the District's motion for declaration of unitary status.

The School District maintains that, of those schools that have not achieved the $\pm 20$ percent target, most are within 1 or 2 points of the goal and, therefore, are essentially desegregated, and of those schools with greater deviations, because of demographics, there is little else, if anything, the District can do to bring them further into compliance, save mandatory busing.

In the 1993–1994 school year, there existed 44 schools in District: 6 high schools, 9 middle schools, and 29 elementary schools. Unlike in 1986, in 1993, *no* school in the District had an enrollment that was 90 percent or more of one race. However, of these 44 schools, 11 did not meet the target of $\pm 20$ percent within the district-wide ratio.[17] The following table charts the eighteen schools out of compliance with a target $\pm 20$ in 1986–1987, before the implementation of the 1988 Plan, and their status in the 1993–1994 school year; those schools identified as magnet schools in the original 1988 Plan are designated with an asterisk (" * "):

| School | 1986 | | | 1993 | | | Improvement |
|---|---|---|---|---|---|---|---|
| | % B | % W | Pts. Out | % B | % W | Pts. Out | |
| *Elementary* | | | | | | | |
| Bloomingdale | 21 | 79 | 20 | 34 | 66 | 7 | 13 |
| *Ellis | 88 | 12 | 8 | 71 | 29 | In | 8 |
| *Gadsden | 82 | 18 | 2 | 72 | 28 | In | 2 |
| Gould | 34 | 66 | 6 | 54 | 46 | In | 6 |
| *Haven | 87 | 13 | 7 | 83 | 17 | 2 | 5 |
| Howard | 31 | 69 | 10 | 39 | 61 | 2 | 8 |
| Pooler | 13 | 87 | 27 | 31 | 69 | 9 | 18 |
| *Spencer | 94 | 6 | 14 | 85 | 15 | 4 | 10 |
| Barnard | 99 | 1 | 19 | | Closed | | — |
| Herty | 86 | 14 | 6 | | Closed | | — |
| Pearl Smith | 98 | 2 | 18 | | Closed | | — |
| Riley | 89 | 11 | 9 | | Closed | | — |
| 38th Street | 100 | 0 | 20 | | Closed | | — |
| Tybee | 5 | 95 | 35 | | Closed | | — |
| *Middle* | | | | | | | |
| *Hubert | 95 | 5 | 18 | 86 | 14 | In | 18 |
| Mercer | 35 | 65 | 4 | 58 | 42 | In | 4 |
| *High* | | | | | | | |
| *Beach | 79 | 21 | 1 | 72 | 28 | In | 1 |
| *Savannah | 84 | 16 | 6 | 86 | 14 | 4 | 2 [18] |

17. During the 1993–1994 school year, the demographics at the elementary level were 61 percent black, 39 percent white. At the middle school level, the numbers were 66 percent black, 34 percent white. The high school ratio in that year was 62 percent black, and 38 percent white.

The Court notes that, since the implementation of the 1988 Plan and magnet programs, white enrollment has remained fairly constant, gaining approximately 700 students over the years 1988–1993. Black enrollment, however, increased at a significantly greater pace; by 1993, 4,000 more black students were enrolled in the system than had been enrolled in 1987. Consequently, in 1993, despite the fact that white enrollment had remained relatively steady, increasing marginally, the overall percentage of whites in the system declined. Overall, of the approximately 35,500 students in the system in 1993, 38 percent were white, and 62 percent were black. (Def.'s Ex. 24.)

18. Although the black enrollment at Savannah High increased by two percent from 1986 to 1993, the school actually came closer to meeting a $\pm 20$ goal in 1993, because, as noted above, the number of black students in the entire System rose as well.

As the above statistics clearly reveal, in *every* school that was out of compliance in 1986, including seven schools designated as magnets in the Plan, there was a significant improvement in racial balance from 1986 to 1993. Six schools previously out of compliance were brought within the goal by 1993. Furthermore, two schools, Haven and Howard, improved considerably and were only 2 percentage points outside of the goal in 1993. Three other schools, Bloomingdale, Pooler, and Spencer were further outside the range at 7, 9, and 4 points, respectively, but showed marked improvement since 1986: Bloomingdale improved 13 percentage points, Pooler 18 percent, and Spencer 10 percent.

Additionally, of the four other schools designated for magnet programs in the 1988 Plan—Bartow Elementary, East Broad Elementary, Garrison Elementary, and Hodge Elementary—two schools, Bartow and East Broad, were within the +20 percent range in 1993. Hodge Elementary was only 2 points outside the target range, and Garrison Elementary was 5 points outside.[19]

Of the remaining system schools, three others were not in compliance in 1993. Two of the schools, Pulaski Elementary and Hesse Elementary, were 2 points or less outside of the +20 percent range. The third, Butler Elementary, was 7 points outside of the established deviation.[20]

Hence, of the eleven schools presently outside the margin set forth in the 1988 Plan, five are within 2 percentage points of the range, leaving six schools—Bloomingdale, Pooler, Spencer, Garrison, Butler, and Savannah High—with deviations more than 2 percentage points from the goal. With regard to these schools, the School Board presented compelling evidence that they are not practicable to desegregate any further due to factors beyond the Board's control.

For example, both Bloomingdale and Pooler Elementary Schools are located in remote areas of Chatham County where the population is predominantly white. With the implementation of magnet programs and M–to–M transfers, the number of black students at these schools has increased considerably, as each school obtained approximately 100 black students through these programs. Consequently, Bloomingdale, which was 79 percent white in 1986, had become 66 percent white by 1993. Similarly, Pooler was 87 percent white in 1986, but 69 percent white by 1993. Dr. Armor testified that, because of the schools' considerable distance from the areas where most of the black population resides, the schools would be unlikely to attract an appreciably greater number of black students in the future, that mandatory busing would unfairly burden black students, and, therefore, there were no other practicable measures that would further desegregate these schools. (Tr. 108–110, 116–117.)

With regard to the other elementary schools that varied more than two points from the target—Spencer, Garrison, and Butler—Dr. Armor testified that the System had vigorously strived to further desegregate the schools through voluntary measures. For example, at Spencer, the System imple-

**19.** The statistics for these schools was as follows:

|  | 1986 | | | 1993 | | | |
| School | % B | % W | Pts. Out | % B | % W | Pts. Out | Improvement |
| *Elementary* | | | | | | | |
| *Bartow | 66 | 34 | In | 74 | 26 | In | — |
| *East Broad | Not | Built | | 79 | 21 | In | — |
| *Garrison | Not | Built | | 86 | 14 | 5 | — |
| *Hodge | 69 | 31 | In | 83 | 17 | 2 | –2 |

(Def.'s Ex. 24.)

**20.** The ratios at these schools were: Pulaski Elementary—82 percent black, 18 percent white; Hesse Elementary—61 percent white, 39 percent black; and Butler—88 percent black, 12 percent white.

mented two separate magnet programs, Honors and an International Studies/Foreign Language magnet, as well as instated a new administrator, in an effort to bring the school closer to the system-wide ratio. (Tr. 117–118.) Such measures have had a notable effect upon the racial balance at the school; in 1986, the school was 94 percent black, but by 1993, that percentage had dropped to 85 percent. (Def.'s Ex. 24.)

Garrison Elementary, a new school built pursuant to the 1988 Plan, opened in downtown Savannah in 1991, and, in 1992, came within 3 percentage points of the goal. Dr. Armor testified that, despite the shortfall, the school's magnet program in biological sciences had been "very successful in drawing a large number of [white] students." (Tr. 112.) Approximately 100 white students have attended the school each year since its opening; without these transfers, the school, because of its zone, would be almost 100 percent black. (Tr. 113.) Instead, with these transfers, the percentage of black students has varied from 83 to 86 percent. (Def.'s Ex. 24.)

Butler Elementary satisfied the $\pm 20$ percent guideline in 1988 when the Plan was implemented, as it was 60 percent white and 40 percent black. However, between 1988 and 1992, it lost much of its white enrollment. Consequently, by 1992, the school was 80 percent black and 20 percent white. Further, in 1993, a new elementary school, Georgetown Elementary,[21] opened, which impacted upon the attendance zone at Butler. In an effort to stem further loss of white students, the System introduced a writing/communications magnet at Butler in 1993, which lessened the net white losses in that year. In commenting upon the present racial balance at Butler, Dr. Armor stated that the magnet "will have the chance of growing some more students, but at this point ... we've reached perhaps ... the maximum number of transfer students ... [and therefore] Butler may not ... make the plus or minus 20." (Tr. 127.)

Finally, Savannah High School, a high school in the original 1988 Plan, was a predominantly white school preceding the 1971 pairing plan, but suffered dramatic loss of its white enrollment in the following decades due to "white flight." Pursuant to the 1988 Plan, in the 1989–1990 school year, the System established a Business/Legal/Financial professions magnet at the School. Unsatisfied with the School's progress, the System implemented a second magnet, a Performing Arts magnet, in the 1991–1992 school year. (Semi–Annual Reports: March 1990, October 1991.) (Tr. 122–123.) As a consequence of these measures, the racial balance at Savannah High has improved 2 percentage points since 1986.

As the above discussion clearly demonstrates, the School System has gone to tremendous lengths to bring those remaining schools outside the $\pm 20$ percentage band into compliance, markedly enhancing the racial balance at most of these schools. Further, the evidence showed that the voluntary transfer programs have, in all likelihood, attained their maximum potential, or are extremely close to that point, as the System has essentially reached the limit of possible magnet and M–to–M student transfers. (Tr. 113, 118.) Not only was this evidence uncontested by the Plaintiffs and the United States, but the United States' expert reached the identical conclusion in his report: "It is reasonable to conclude that the voluntary transfer desegregation results achieved to date may have reached their maximum level." (Govt.'s Ex. 2 at VII–2.) Hence, no party anticipates that voluntary transfers will produce further desegregation in those remaining schools outside the $\pm 20$ target.

Lastly, there was absolutely *no* evidence presented at the hearing by the Plaintiffs or the United States, or present in the record, suggesting that there existed *any* additional, practicable measures that could be undertaken by the School District that would effect further, significant desegregation in those

---

**21.** Georgetown opened well within the racial balance guidelines, with 53 percent white students

and 47 percent black students.

schools that remained outside the $\pm 20$ percent range.[22]

## B. *Facilities and Resources*

### 1. *Present Facilities*

The School Board has taken extraordinary steps to remedy any distinctions between the facilities of historically black schools and historically white schools. Several historically black schools in the inner city of Savannah have been closed, and two new schools costing approximately $20 million have been constructed in downtown Savannah to replace them. (Def.'s Ex. 9.) Further, millions of dollars have been spent in renovating and upgrading other historically black schools, particularly those in the City of Savannah. (Def.'s Ex. 9.)

Additionally, the School Board introduced evidence demonstrating that any discrimination in the distribution of resources has been eradicated. In particular, Dr. Armor conducted studies concerning the System's allocation of funds, expenditures for supplies and equipment, pupil-teacher ratios, average teacher experience, and teachers with advanced degrees, and concluded that no significant differences existed between majority black schools and those with substantial white enrollments. (Def.'s Exs. 17, 18, 19, 20, 21, 22.) Further, to the extent that any perceivable distinctions existed, the evidence generally indicated that considerably more resources have been allocated to schools with black enrollments exceeding the district-wide average, rather than to schools with substantial white enrollments. (Tr. 140–147.)

Moreover, Mr. Carey, the United States' expert, visited each school in the District and found no discrepancies based on race. In his report, he stated:

> By evaluating all of the facilities at one time, we were better able to note any disparities, if they existed.... Based upon our experience in visiting many

school facilities at different school systems, we would have made special note of any fundamental problems that would evidence discrimination based upon race or economic level.... *No such situations were observed, however.*

(Govt.'s Ex. 2 at IV–13.) (Emphasis added.) Accordingly, in its proposed findings of fact, the United States submitted: "Mr. Carey did not observe any inequities in facilities, maintenance or renovation across the system." (Govt.'s Proposed Findings of Fact and Conclusions of Law at 13, ¶ 51.)

### 2. *Proposed Building Program*

In 1993, after assessing the conditions at present facilities and population growth trends in Chatham County, the School Board determined that considerable upgrading of facilities and numerous new schools would be required to meet education needs and population growth during the next decade and beyond. (Def.'s Ex. 25.) Consequently, the Board appealed to the citizens of Chatham County, and, in March 1994, voters approved a bond issue of $108 million for the System's schools. (Def.'s Ex. 30.)

The proposed construction plan for the years 1995 through 2000 provides for the building of nine new schools: five elementary schools, three middle schools, and one high school. In addition, extensive renovations are planned for all the middle schools, which, at present, experience severe overcrowding. Further, the plan projects the construction of art, music, and physical education facilities at six elementary schools that currently do not possess them. (Def.'s Ex. 30.)

Ms. Karen Matthews, the School Board President, and a member of the Board for the past seven years, spoke in some detail concerning the proposed plan. Ms. Matthews testified that the only elementary school scheduled to be built during the next

---

**22.** Not only did the Plaintiffs and the United States fail to present any evidence of further practicable measures that could be effected, but they appeared to agree with the School Board's evidence that further gains were infeasible. Indeed, Mr. Kelly Carey, the United States' expert testified as follows:

Q: You're not suggesting that every school in the system could be balanced within plus or minus 10 percent or 20 percent?
A: No, ma'am. I'm a practical planner. I don't see that.
(Tr. 262.)

three years is a replacement school for Sprague and Haynes Elementary schools. Additionally, the plan anticipates the opening of two new middle schools in the 1996–1997 year. At the high school level, the plan envisions converting Savannah High School to a dedicated magnet school for the arts, and then building a new high school to be named Savannah High, which would open in the 1997–1998 school year. Construction of the remaining five schools is scheduled to occur sometime after 1997.

Ms. Matthews, Dr. Patrick Russo, the Superintendent of the Savannah–Chatham County Schools, and Dr. Geri Smith, the Assistant Superintendent and coordinator for all desegregation programs, all testified that, in their opinions, the new building program would not have a negative impact on desegregation in the District, and would possibly even enhance desegregation endeavors. (Tr. 29–30, 32–33, 64–65, 72–73.) Further, Ms. Matthews, Dr. Russo, and Dr. Smith all stated unequivocally that desegregation had been taken into account in the planning process for building and in the tentative selection of all of the school sites. (Tr. 33, 63–64, 72–73.)

Concerning the building plans within the next three years, these witnesses observed that the new elementary school would be replacing two elementary schools that are presently racially balanced, and therefore, the Board anticipated "no change racially to the makeup of [the new] school", as the new school would be in the same geographic area and would likely utilize the same attendance zone as the present schools. (Tr. 26, 64.)

Regarding the construction of two new middle schools, the witnesses noted that all of the middle schools are presently racially balanced and that the School System is fully committed to preserving those balances. Further, Ms. Matthews testified that the Board was confident that the these new schools would be racially balanced because the sites currently selected were located near major traffic arteries, and in areas that would enable the System to easily integrate those schools. (Tr. 31.)

Finally, with regard to high school construction, Ms. Matthews, Dr. Russo, Dr. Smith, and Dr. Armor all testified that a replacement school for Savannah High School would aid in desegregating the school. For example, Dr. Armor noted that a new high school in a different location could be zoned to "substantially improve the enrollment from what it is now." (Tr. 123.) In addition, Ms. Matthew observed that the site presently proposed for the new school, in the Garden Homes area, had been approved by each of the three black members of the School Board, and "may have even been the preferable site for all of them." (Tr. 32–33.) Moreover, the Board intends to render the present Savannah High School a dedicated magnet for the performing arts, which would serve to integrate that school. (Tr. 33.)

### C. Faculty and Staff

During the 1993 school year, 37 percent of the teachers in the Savannah–Chatham County School District were black. (Govt.'s Ex. 2, Sect. VI.) The percentage of black faculty at all of the District's 44 schools, except one,[23] was within 15 percentage points of the district-wide black faculty average during the last three school years. (Tr. 133–136.) (Def.'s Ex. 16.) (Govt.'s Ex. 2 at VI–B–6.) Further, 35 schools were within 10 percentage points of the district-wide ratio during this time period. (Govt.'s Ex. 2, Sect. IV.) (Def.'s Ex. 16.)

At present, 42 percent of the District's principals and assistant principals are black. (Semi–Annual Report: October 1993 at 140.) There is no evidence of any discriminatory assignment of staff; indeed, in 1993, there existed a slightly *higher* percentage of black administrators in schools that were more than 40 percent white than in those schools less than 40 percent white. (Tr. 138.) (Def.'s Ex. 26.)

Finally, the School District aggressively recruits qualified minority teachers by tar-

---

**23.** In 1993, at Spencer Elementary, the faculty ratio was 55 percent black and 45 percent white, thus placing the school 21 points outside the district-wide ratio. (Govt.'s Ex. 2 at VI–B–6, Table 2.)

geting colleges with high minority students bodies. (Tr. 63.)

### D. *Remaining Green Factors*

There is no dispute among the parties concerning the two remaining factors outlined in *Green.* (Tr. 174.) Specifically, transportation is provided on a non-discriminatory basis, and to all non-resident students participating in the magnet and M–to–M programs. Additionally, the School System's practices and policies regarding extra-curricular activities are non-discriminatory.

## CONCLUSIONS OF LAW

■ The Supreme Court first articulated the concept of unitary status in *Green,* where it held that the duty of a school district once segregated by law is to "take whatever steps might be necessary to convert to a *unitary system* in which racial discrimination would be eliminated root and branch." *Id.,* 391 U.S. at 437–438, 88 S.Ct. at 1694 (emphasis added). Hence, this status represents the "accomplishment" of desegregation and is the ultimate goal to which a court tailors its remedies once a finding of intentional discrimination is made. *Id.,* 391 U.S. at 436, 88 S.Ct. at 1693; *Morgan v. Nucci,* 831 F.2d 313, 319 (1st Cir.1987).

While such a conversion has entailed a lengthy road for many districts, the Supreme Court has also ruled that *Brown, Green* and their progeny do not require federal courts to retain jurisdiction over school desegregation cases forever. In *Board of Educ. of Oklahoma City v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), the Supreme Court observed:

> From the very first, federal supervision of local school systems was intended as a *temporary* measure to remedy past discrimination....
>
> Such [desegregation] decrees ... are not intended to operate in perpetuity.... Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that "necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of

such systems not extend beyond the time required to remedy the effects of past intentional discrimination."

*Dowell,* 498 U.S. at 248, 111 S.Ct. at 637, 112 L.Ed.2d at 728 (quoting *Milliken v. Bradley,* 433 U.S. 267, 280–282, 97 S.Ct. 2749, 2757–2758, 53 L.Ed.2d 745 (1977)) (emphasis added). Similarly, in *Freeman v. Pitts,* 503 U.S. ——, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992), the Supreme Court reiterated:

> [T]he court's end purpose must be to remedy the violation and in addition to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution....
>
> [R]eturning schools to the control of local authorities at the earliest practicable date is *essential* to restore their true accountability in our governmental system.

*Id.,* 503 U.S. at ——, 112 S.Ct. at 1445, 118 L.Ed.2d at 134 (emphasis added). Hence, in *Freeman,* the Supreme Court ruled that, to expedite restoration of local control, a court has discretion to order an incremental or partial withdrawal of its supervision, thereby allowing a school system to achieve compliance in one facet of its operations before it has fulfilled the whole of its affirmative duty.

The Court also described factors which should be examined by courts in determining whether unitary status has been realized:

> A court's discretion to order the incremental [or complete] withdrawal of its supervision in a school desegregation case must be exercised in a manner consistent with the purposes and objectives of its equitable power. Among the factors which must inform the sound discretion of the court in ordering partial [or complete] withdrawal are the following: *whether there has been full and satisfactory compliance with the decree* in those aspects of the system where supervision is to be withdrawn; *whether retention of judicial control is necessary or practicable to achieve compliance with the decree* in other facets of the school system; and *whether the school district has demonstrated,* to the public and to the parents and students of the once disfavored race, *its good faith commitment to the whole of the court's decree* and to

those provisions of the law and the constitution that were the predicate for judicial intervention in the first instance.

*In considering these factors a court should give particular attention to the school system's record of compliance.* A school system is better positioned to demonstrate its good-faith commitment to a constitutional course of action when its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations. . . .

These are the premises that guided our formulation in *Dowell* of the duties of a district court during the final phases of a desegregation case: "The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable."

*Freeman,* 503 U.S. at ——, 112 S.Ct. at 1446, 118 L.Ed.2d at 134–135 (quoting *Dowell,* 498 U.S. at 249–250, 111 S.Ct. at 638, 112 L.Ed.2d at 729) (emphasis added). *See also Lee v. Talladega County Bd. of Education,* 963 F.2d 1426, 1430 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1257, 122 L.Ed.2d 655 (1993) ("When local school authorities demonstrate that they have complied in good faith with the district court's desegregation decree and that the vestiges of their prior illegal racial discrimination have been eliminated to the extent practicable—in short, that their school system has attained unitary status—the court should and must return control over their school system to the local school authorities.")

■ Additionally, it is the school district which bears the burden of proving that it is entitled to unitary status, as it "bears the

burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation." *Freeman,* 503 U.S. at ——, 112 S.Ct. at 1446, 118 L.Ed.2d at 137.

The various aspects of a school system which a court must scrutinize to divine racial identifiability in the school system, or vestiges of past violations, are those first identified in *Green:* to-wit, student assignments, faculty, staff, transportation, extracurricular activities, and facilities. *Green,* 391 U.S. at 435, 88 S.Ct. at 1692. In the instant case, the only areas at issue are those of student assignments, and faculty and staff.[24]

### A. Unitariness in Student Assignments

■ In applying the factors iterated by the Supreme Court in *Freeman,* the Court finds that the School District has desegregated its schools to the maximum extent practicable, substantially complied with the elements of the desegregation decree, demonstrated good faith in all of its actions, and, therefore, that federal judicial control is no longer necessary or justified.

The facts of this case clearly indicate that the School District has effected momentous changes since the 1988 decree was entered, and has accomplished substantial desegregation in its schools. The District has executed a massive and innovative voluntary desegregation program that has largely succeeded. Indeed, more students now attend racially balanced schools than at any other time since the initial implementation of the mandatory pairing plan in 1971. And, significantly, unlike the fleeting desegregation which occurred under the 1971 Plan, the recent endeavors by the School Board intimate protracted, stable desegregation.[25]

---

**24.** Additionally, in *Pitts v. Freeman,* 887 F.2d 1438, 1145 n. 8 (11th Cir.), *rev'd on other grounds,* —— U.S. ——, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992), the Eleventh Circuit held that the *Green* Court "intended quality of education to be considered in conjunction with each of its six enumerated factors." The district court in that case measured quality of education by considering the distribution of educational resources (*e.g.,* per pupil expenditures, teachers with advanced degrees, teachers with more experience, library books). *Freeman,* —— U.S. at ——, 112 S.Ct. at 1441, 118 L.Ed.2d at 129.

In this case, however, there is no contention by the Plaintiffs or Plaintiff–Intervenor that there is racial disparity in the provision of resources. *See supra* at III.B.1.

**25.** Moreover, the Court is particularly gratified to see that the School Board has not lost sight of its fundamental purpose—to provide every student in the district a quality education without regard to race. The District's progress is borne out by the testimony of Dr. Patrick Russo, the System's Superintendent, who described considerably increased test scores, attendance rates, graduation rates, scholarship awards, and post-

While in no way attempting to detract from the School District's success, the Plaintiffs and the United States argue that the System should not be granted unitary status because not every school in the District has met the ±20 percent goal set forth in the desegregation decree of 1988. However, contrary to their assertions, the law does not demand such rigidity or mathematical precision.

Indeed, in *Freeman v. Pitts,* statistics revealed that the DeKalb County School System was extremely imbalanced racially: (1) 47 percent of the students in the DeKalb County School District were black; (2) 50 percent of the black students attended schools that were over 90 percent black; (3) 62 percent of all black students attended schools that had more than 20 percent more blacks than the systemwide average; (4) 27 percent of white students attended schools that were more than 90 percent white; (5) 59 percent of the white students attended schools that had more than 20 percent more whites than the systemwide average; (6) of the 22 high schools, five had student populations that were more than 90 percent black, while five other schools had student populations that were more than 80 percent white; and (7) of the 74 elementary schools, 18 were over 90 percent black, while 10 were over 90 percent white. *Freeman,* 503 U.S. at —— ——, 112 S.Ct. at 1438, 118 L.Ed.2d at 125–126. The district court found, however, that the significant racial imbalance in these schools was not a vestige of the prior de jure system, and was, instead, a result of demographic changes in DeKalb County. Additionally, the district court noted:

> [A]bsent massive bussing, which is not considered as a viable option by either the parties or this court, the magnet school program and the M–to–M program, which the defendants voluntarily implemented and to which the defendants obviously are dedicated, are the most effective ways to deal with the effects on student attendance of the residential segregation existing in DeKalb County at this time.

secondary education rates during recent years. (Tr. 74–76.) (Def.'s Ex. 8.) Further, heightened public support for the public schools is manifest from the successful passage of two bond referen-

*Id.,* 503 U.S. at ——, 112 S.Ct. at 1440, 118 L.Ed.2d at 128.

The Eleventh Circuit reversed the district court's decision granting unitary status with regard to student assignments, asserting that the law required further action, even if such measures were "administratively awkward, inconvenient, and even bizarre in some situations...." *Pitts,* 887 F.2d at 1450. The Supreme Court, however, pointedly reversed the Eleventh Circuit's ruling:

> The Court of Appeals was mistaken in ruling that our [decisions] ... require "awkward," "inconvenient" and "even bizarre" measures to achieve racial balance in student assignments in the late phases of carrying out a decree, when the imbalance is attributable neither to the prior de jure system nor to a later violation by the school district but rather to independent demographic forces.

*Freeman,* 503 U.S. at ——, 112 S.Ct. at 1447, 118 L.Ed.2d at 136. The Court went on to hold:

> *That there was racial imbalance in student attendance zones was not tantamount to a showing that the school district was in noncompliance with the decree or with its duties under the law. Racial balance is not to be achieved for its own sake.* It is to be pursued when racial imbalance has been caused by a constitutional violation. Once the racial imbalance due to the de jure violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors.

*Id.* (emphasis added). *See also Id.* at ——, 112 S.Ct. at 1456, 118 L.Ed.2d at 148 (J. Blackmun, J. Stevens and J. O'Connor, concurring) (A school system's obligation to desegregate "does not always require the district court to order new, affirmative action simply because of racial imbalance in student assignment"; a court should assess whether changes in student assignment are "necessary or practicable" to achieve compliance

dums in 1990 and 1994. The Court commends the School Board, administration, and faculty on these positive developments.

with the decree, and whether the district's conduct is a contributing cause of the racially identifiable schools.); *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 23–24, 91 S.Ct. 1267, 1279, 28 L.Ed.2d 554 (1970) (Courts' objective "does not and cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools. . . . If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. *The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole."*) (emphasis added).

Hence, as evinced by its decisions in *Freeman* and *Swann*, the Supreme Court has clearly recognized that predominantly one-race schools, are, unfortunately, often a reality of modern urban life, and, therefore, do not necessarily preclude a finding of unitary status. Lower courts, as did the district court in *Freeman*, have also so ruled. For instance, in *Morgan v. Nucci*, 831 F.2d 313 (1st Cir.1987), the First Circuit upheld a finding of unitary status for the Boston public schools, despite the fact that some 25 schools failed to comply with the district court's student assignment orders, and 13 schools had student bodies exceeding 80 percent of one race. In upholding unitary status, the First Circuit noted that the school district had performed in good faith in striving to desegregate the schools, and cogently observed:

> [I]t is the maximum *practicable* desegregation that the law requires. This is a practical, not a theoretical standard. A court should not remain involved in the assignment process indefinitely merely because some further degree of compliance with assignment standards is conceivable. *See Calhoun v. Cook*, 525 F.2d 1203 (5th Cir. 1975) ("[i]t would blink reality and authority . . . to hold the Atlanta School System

to be nonunitary because further integration is theoretically possible").

\* \* \* \* \* \*

Little in the record suggests, however, that implementation beyond what presently exists is likely to be obtained. . . . The hope of fuller compliance is insufficient to justify the court's imposition of perpetual assignment orders. As Justice Powell stated, "perfect solutions may be unattainable in the context of the demographic, geographic, and sociological complexities of modern urban communities." *Estes v. Metropolitan Branches of Dallas NAACP*, 444 U.S. 437, 448 [100 S.Ct. 716, 721, 62 L.Ed.2d 626] (1980) (Powell, J., dissenting from the dismissal of writs of certiorari as improvidently granted).

Second, even if some upgrading of attendance patterns were reasonably possible, such fine tuning would not warrant the court's continued indefinite involvement. Both the Supreme Court and this court have repeatedly stated that a judicially imposed desegregation remedy goes too far if it attempts to engineer some sort of idealized racial balance in the schools.

*Morgan*, 831 F.2d at 324.

Similarly, the district court for the Northern District of Texas held that the Fort Worth Independent School System was unitary, despite variances in student assignments from goals articulated in the desegregation plan. The school system had implemented extensive desegregation measures, including pairing, M–to–M transfers, and magnet schools. However, in a system that was 36 percent black and 26 percent Hispanic, 14 out of 98 schools in the district remained more than 80 percent black. Remarking that unitary status is not a "mathematical construction," the court did not order further remedies to student assignments. Instead, it found that "absent desegregation busing . . . no additional remedial tools could be utilized to adjust the racial makeup of student assignments," and held that the vestiges of the dual system had been removed. *Flax v. Potts*, 725 F.Supp. 322, 328 (N.D.Tx. 1989). On appeal, the Fifth Circuit upheld the district court's finding of unitariness. *Flax v. Potts*, 915 F.2d 155 (5th Cir.1990).

Analogously, in *Ross v. Houston Independent School Dist.*, 699 F.2d 218 (5th Cir. 1983), the Fifth Circuit acknowledged that a finding of unitariness, or that a school district has eliminated the vestiges of de jure segregation, does not always indicate a state of complete integration. While 55 out of 226 schools in the Houston school district had student populations 90 percent or more black, in a district that was 20 percent white, 38 percent black, and 42 percent Hispanic, the Fifth Circuit nonetheless affirmed the district court's finding of unitary status. The Circuit noted the district court had found that greater integration of student bodies was unattainable "without untoward costs on the students themselves." *Ross*, 699 F.2d at 224. Hence, the Circuit affirmed the district court's finding that the school district had taken all practicable steps to desegregate, and, thus, past vestiges had been eliminated: "Constructing a unitary school system does not require a racial balance in all of the schools. What is required is that every reasonable effort be made to eradicate segregation and its insidious residue." *Id.*, 699 F.2d at 227–228. *See also Dowell v. Board of Educ. of Oklahoma City Public Schools*, 8 F.3d 1501, 1515 (10th Cir.1993) (noting that racially imbalanced schools in and of themselves are not violative of the Constitution).

In the instant case, there is no evidence or inference that the racial imbalance existent at numerous schools is the result of circumstances other than the high percentage of minority students in the System, and segregated residential patterns that continue to exist in Chatham County. School officials have not contributed to the current imbalance in any way, and, in fact, have made enormous efforts to counter the effects of past discrimination and present-day private choices by citizens. The School Board cannot be held accountable for residential patterns or for "white flight" from the public schools. As the Fifth Circuit Court of Appeals has pointed out, "[w]hile those charged with desegregation must not shrink from the threat of white flight, school officials who have taken effective action have no affirmative fourteenth-amendment duty to respond to those who vote with their feet." *Ross*, 699 F.2d at 225.

Moreover, no party in this case has suggested *any* additional measures that would further desegregate the schools in Savannah and Chatham County. Mandatory pairing and massive bussing are not offered as viable options by any party, and the Court finds that such measures are particularly unsuitable, given their previous use and colossal failure to accomplish their aims. Hence, the record indicates that further desegregation measures would be both impractical and detrimental to education.

Additionally, the record is uncontroverted that the School Board and school officials have manifested good faith every step of the way, for in excess of two decades. Indeed, as the Court found in 1988, the School Board suggested and faithfully implemented the sweeping, comprehensive pairing and busing plan of 1971 under which the public schools operated for many years. And, as the Court noted, "[t]he failure of that plan to achieve and maintain a desegregated school system was not due to any reluctance or failure of the School Board to implement the plan." *Stell*, 724 F.Supp. at 1400. The Eleventh Circuit also remarked upon the School Board's commitment to desegregation, stating in 1989: "[T]he school board appears here to be fully committed to the success of ... [the 1988] plan and to making adjustments from time to time to make it so." *Stell*, 888 F.2d at 84.

And, the School Board's consistent commitment to desegregation has not diminished with time. The System has substantially complied with the Court's 1988 desegregation order, and has gone to extraordinary lengths to make the Plan a successful one. To the extent that any racial balance goals have not been achieved in some individual schools, such shortfalls have not been due to any lack of dedication on the part of the School System. Indeed, in response to a direct query by the Court, Dr. David Armor, who has worked with many school systems throughout the nation, stated that he had observed absolutely no recalcitrance or reluctance on the part of school officials to carry out the Plan, and, in fact, that "this District ... and administrators ha[d] been among the best

that [he] ha[d] dealt with." (Tr. 150.) Likewise, the Plaintiffs and the United States unhesitatingly acceded to the School Board's and school administrators' commitment and good faith.

As a final matter, however, the Plaintiffs and the United States urge that, notwithstanding the Board's success and demonstrated good faith, the Court should delay declaration of unitary status until further action is undertaken pursuant to the School System's renovation and construction plans for the future. In support of their argument, they note that, until a school system achieves unitary status,

> it has an affirmative duty to eliminate the effects of its prior unconstitutional conduct. To fulfill this duty, school officials are obligated not only to avoid any official action that has the effect of perpetuating or reestablishing a dual school system, but also to render decisions that further desegregation and help to eliminate the effects of the previous dual school system. Thus, the duty to desegregate is violated if a school board fails to consider or include the objective of desegregation in decisions regarding the construction and abandonment of school facilities.

*Harris v. Crenshaw County Bd. of Educ.,* 968 F.2d 1090, 1094–1095 (11th Cir.1992).

The Court observes that, while the Plaintiffs and the Plaintiff–Intervenor correctly state the law concerning a school district's duties under a desegregation order, neither in *Harris,* nor in any other case cited by them on this point, did a court consider a motion for unitary status, but instead, was concerned solely with objections to new construction or the closing of schools, which would potentially affect the existing desegregation order.

In this case, since 1988, the School District has timely and routinely sought the Court's approval for any action potentially impacting upon desegregation, such as its construction of two new schools that were not provided for in the desegregation plan, and modifications of various attendance zones. In each instance, the District has carefully assessed the action's effect upon desegregation, continually striving to improve racial balances,

and the Plaintiffs and the United States have consented to these modifications of the Plan, never insinuating at any time that the Board acted from improper motivations whatsoever.

With regard to the proposed new schools, the earliest school is not scheduled to open until sometime in early 1996. One other school, a middle school, is not scheduled to open until late 1996, more than two years hence. The remaining schools are not anticipated to open until after 1997 and beyond. Sites are still being assessed and considered for these schools. Moreover, it is premature to predict neighborhood demographic changes that may ensue and therefore to draw specific attendance zones for schools not expected to be in existence for two to seven years. Consequently, no party has suggested that the School Board should have filed with the Court, at this early date, proposed modifications to the desegregation plan.

The Court observes that, significantly, no party has pointed to any evidence intimating bad faith on the part of the School Board during the entire history of federal court supervision, nor is there evidence that the Board is seeking to shirk its responsibility now. Indeed, three witnesses, the School Board President, the System Superintendent, and the coordinator for desegregation efforts all testified to the System's continued eye toward desegregation in this process, for example, in its consideration of school sites and in its decision to create a dedicated magnet at what is presently Savannah High School. The Court finds, therefore, that the School District has in no way violated any affirmative duties to desegregate under the desegregation order.

Additionally, the Court notes that the Board has formally evinced its commitment to continuing desegregation efforts in a resolution adopted on April 21, 1993 which provides, in pertinent part:

> RESOLVED that the Board is committed to continuing its desegregation efforts, including its goal that each school be desegregated to within $\pm 20$ of the district-wide standard ratio, the M–to–M transfer program and the magnet and Select pro-

grams, and that it does not intend or anticipate any substantial changes or departures from the 1988 Magnet Plan when it is declared unitary.

(Def.'s Ex. 2.) *See Brown v. Board of Educ. of Topeka,* 978 F.2d 585, 591 (10th Cir.1992) (school board's resolution declaring intention to comply with Constitution in the future some evidence of good faith), *cert. denied,* —— U.S. ——, 113 S.Ct. 2994, 125 L.Ed.2d 688 (1993); *Dowell v. Board of Education of Oklahoma City Public Schools,* 8 F.3d 1501, 1513 (10th Cir.1993); *Lee v. Talladega County Bd. of Educ.,* 963 F.2d 1426, 1432 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1257, 122 L.Ed.2d 655 (1993).

Further, minorities have assumed some positions of responsibility within the school system, for example, comprising a significant percentage of staff. And, on the present School Board, three of the nine positions are held by black persons, two of which voted with the remainder of the Board in favor of seeking unitary status. Thus, minority presence in the power structure is a factor that might be expected to help prevent any regression to a dual system once the court's presence is withdrawn. *See, Morgan,* 831 F.2d at 321 (considerable presence of minorities in school system may prevent reversion to dual system); *Riddick v. School Bd. of City of Norfolk,* 784 F.2d 521, 528 (4th Cir. 1986) (noting that the racial integration of Norfolk's school board made discriminatory funding unlikely), *cert. denied,* 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986).

■ No one instant in time is especially "fitting" or "ideal" in the pronouncement of unitary status. Indeed, one court has noted that "unitariness is less a quantifiable 'moment' in the history of a remedial plan than it is the general state of successful desegregation." *Morgan,* 831 F.2d at 321. A school system will always be in a state of transformation, as it responds to current circumstances and prepares for prospective growth and needs. When a system has, however, effected desegregation to the extent practicable, federal court supervision of the public school system must come to an end. The Savannah–Chatham County Schools are either unitary or not in respect to student assignments, and a fear that a system may resegregate in the future, absent credible evidence to support those fears, does not justify a federal court's continued monitoring of the system. *Singleton v. Jackson Mun. Separate School Dist.,* 541 F.Supp. 904, 914 (S.D.Miss.1981) (unsubstantiated fear that system might resegregate was insufficient to delay granting of unitary status).

Accordingly, the Court finds that the School District has complied in good faith with the Court's desegregation decree, has met its affirmative duties to desegregate, and has eradicated the vestiges of past discrimination to the maximum extent practicable. Concluding that further intervention by this Court in the area of student assignments is unnecessary and unwarranted, the Court hereby **GRANTS** the Defendant's motion for unitary status with regard to student assignments.

### B. *Unitariness in Faculty and Staff*

■ In *Singleton v. Jackson Mun. Separate School Dist.,* 419 F.2d 1211, 1217–1218 (5th Cir.1970), the former Fifth Circuit[26] held that "principals, teachers, teacher-aides and other staff who work directly with children at school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students." Hence, the Circuit held that a school district operating under a desegregation order must assign faculty and staff "so that the ratio of Negro to white teachers in each school ... are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system." *Id.* at 1218.

Different courts have permitted varying margins in their interpretations of *Singleton.* In applying *Singleton* to the DeKalb County School District, the Eleventh Circuit ruled that the district court's allowance of a fifteen percent variance in each school from the

---

**26.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

system-wide ratio did not constitute an abuse of discretion, and, thus, such deviation did not violate the principles of *Singleton. Pitts,* 887 F.2d at 1447. *See also Flax v. Potts,* 915 F.2d 155, 163 (5th Cir.1990) (upholding district court's declaration of unitary status with regard to faculty even though six schools lay more than 20 percentage points outside system-wide ratio).

In this case, the record reveals that the faculty or teacher ratios at 80 percent of the schools, or 35 out of 44, lie within an even narrower 10 percentage points of the district-wide faculty ratio. Furthermore, 98 percent of the schools, or 43 out of 44 meet a 15 percent variance. The one remaining school lies only slightly outside a 15 percent margin, as it is presently 21 percent away from the district-wide ratio, with a faculty ratio of 55 percent black and 45 percent white.

Additionally, there is no dispute that staff, or principals and assistant principals, have been assigned in a nondiscriminatory fashion. Furthermore, the evidence showed that the School District has been among the leaders in the State of Georgia in recruiting and hiring black faculty and staff, as approximately 40 percent of staff and faculty are presently black.

Accordingly, the Court finds that the School District has eliminated all discrimination in hiring and assigning faculty and staff, and has eradicated the vestiges of past discrimination to the extent practicable. The School District's motion for unitary status with regard to faculty and staff is hereby **GRANTED.**

## CONCLUSION

After twenty-three years of supervision, the time has come for the Court to cease acting as a sword in dictating the administration of the Savannah–Chatham County School District, and as a shield in striving to remedy past and prevent future discrimination. This school system has courageously met the challenge placed before it by the Court in 1971, and again in 1988. And, because of the commitment of many persons, past and present, throughout the school system, the District has succeeded in accomplishing its task of desegregating the schools to the maximum extent feasible. Therefore, the school system, by complying in good faith with the Court's decrees, has earned the right to be free of the Court's restraint and to proceed on its own.

The Court is not deaf to the exhortations of those who point to various shortfalls and who would have the Court manage the affairs of the School District indefinitely. Unfortunately, perfection, albeit enticing, is frequently unattainable. If the District is not allowed to reap the rewards of its momentous efforts, and is instead admonished to accomplish the near-impossible, the Court then shifts from ensuring racial integration to imposing an exercise in futility. The Court will not assume that role. Further judicial monitoring would transgress cherished principles of federalism, and is no longer justifiable in this case. Indeed, as Justice Kennedy wisely wrote for the majority in *Freeman:*

> Returning schools to the control of local authorities at the earliest practicable date is *essential* to restore their true accountability in our governmental system. *When the school district and all state entities participating with it in operating the schools make decisions in the absence of judicial supervision, they can be held accountable to the citizenry, to the political process, and to the courts in the ordinary course. . . . .* [I]t must be acknowledged that the potential for discrimination and racial hostility is still present in our country, and its manifestations may emerge in new and subtle forms after the effects of de jure segregation have been eliminated. It is the duty of the State and its subdivisions to ensure that such forces do not shape or control the policies of its school systems. *Where control lies, so too does responsibility.*

*Freeman,* 503 U.S. at ——, 112 S.Ct. at 1445, 118 L.Ed.2d at 134 (emphasis added).

Justice Kennedy's words aptly bring this Court to its closing. In withdrawing, the Court reminds the parties and this community of the elements that have permitted the District to reach this threshold: hard work, and intense community involvement in the public schools. There is no matter of more crucial importance to the community's future,

to Georgia's future, or to the nation's future than that of quality education. And, a superior public education system is vital to the *entire* community, not just to those parents and students presently in the system; the bedrock of a prosperous, progressive and free society is a well-educated citizenry. Indeed, a strong educational system is *essential* in preparing our children to meet the demands of an increasingly sophisticated world, and in enabling them to be productive, responsible and thoughtful citizens who may in turn contribute to the community in which they live. The Court therefore urges the parties and the community to learn from its past partnership, and to build on that relationship in order to ensure continued progress in the years ahead.

Accordingly, for the reasons set forth in this Order, the Savannah–Chatham County School District is declared *unitary* in all aspects, this action is **DISMISSED** with prejudice, and all injunctions against the School Board and School System are hereby **DISSOLVED.**

SO ORDERED.