Anthony T. LEE, et al., Plaintiffs,

United States of America, Plaintiff–Intervenor and Amicus Curiae,

National Education Association, Inc., Plaintiff–Intervenor,

Alexander Kato, et al., Plaintiffs–Intervenors,

v.

GENEVA COUNTY BOARD OF EDUCATION, Alabama State Board of Education, et al., Defendants.

Civ. A. No. 1056–S.

United States District Court,
M.D. Alabama,
Southern Division.

July 5, 1995.

---

Solomon S. Seay, Jr., Montgomery, AL, for Anthony T. Lee, Nat. Educ. Ass'n, Inc., J. Celeste Holt, John E. Williams.

Gary Haugen, U.S. Dept. of Justice, Civ. Rights Div., Educ. Opportunities Section, Deval L. Patrick, U.S. Dept. of Justice, Civ. Rights Div., Sp. Litigation Section, Washington, DC, for U.S.

Donald B. Sweeney, Jr., Rives & Peterson, Birmingham, AL, M. Dale Marsh, Cassady, Fuller & Marsh, Enterprise, AL, for Geneva County Bd. of Educ.

## MEMORANDUM OPINION & ORDER

ALBRITTON, District Judge.

This case is now before the court on the Geneva County Board of Education's ("Board's") petition seeking approval of its proposal to relocate students currently enrolled in grades 6–12 at Coffee Springs School to other schools in its system and to discontinue those grades at Coffee Springs.

The Board's petition was filed on March 15, 1995. A hearing date was set and the parties given an opportunity to file responses to the petition.

The Plaintiffs opposed the petition. The Intervenor, National Education Association, Inc., did not appear. The Plaintiff–Intervenor, United States of America, appeared and took the position that there was no basis in law to object to the Board's petition.

On May 3, 1995, the court granted leave for permissive intervention to Alexander Kato and other black students at Coffee Springs School and their parents, and refused to allow intervention by others.

An evidentiary hearing was held on May 31 through June 2, 1995 and post-trial briefs have been filed by the parties. After carefully considering the evidence presented, the briefs of the parties, and the applicable law, and based upon findings of fact and conclusions of law stated hereafter, the court finds that the petition is due to be GRANTED.

This case involves a decision which ideally should be left strictly to that body charged by law with the responsibility of providing a public education for the children of Geneva County. That body is the locally elected Board of Education, and it is the local Board that must make hard choices as to the best allocation of scarce funds which are available for that purpose.

The only reason that this federal court is involved in this essentially local educational decision is that at this time, over forty years after the Supreme Court declared the racial segregation of public schools by state law to be unconstitutional, and twenty-five years after this court entered an order approving and ordering implemented a plan submitted by this Board as being designed to completely dismantle the racially segregated dual public school system in Geneva County, the system still has not been judicially determined to be unitary. Since it has not, this change cannot be made without the approval of this court.

Approval is not had, however, by this court acting as a "super school board" to agree that closing Coffee Springs grades 6–12 will be in the best educational interests of the school children in the Geneva County school system as a whole. Neither could approval be denied by this court finding that the best interest of the school children and community of Coffee Springs would be better served by requiring the Board to use its funds to continue to maintain grades 6–12 there. Those are difficult choices and decisions which must be left in the hands of the local educational authorities. The only role that this court has in this matter is a narrow one,

focusing on the effect of the proposal on the goal of disestablishing a dual school system. It is with that narrow role in mind that the court now makes findings of fact and conclusions of law.

### Findings of Fact

This school desegregation litigation is an outgrowth of *Lee v. Macon County Bd. of Educ.,* 267 F.Supp. 458 (M.D.Ala.1967), *aff'd sub nom, Wallace v. United States,* 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967) (3 Judge Court). In that case, a three-judge district court ordered Alabama's legal school districts, including Geneva County, to disestablish their racially segregated school systems. The districts were ordered to operate under a freedom of choice plan for the 1967–68 school year. *Id.* at 486–88.

In 1969, the three-judge court found that despite making some progress, Geneva County was still operating a racially dual school system. The Court required the development and submission by January 15, 1970, of plans designed to dismantle the dual system, and it requested the assistance of the U.S. Office of Education for this purpose. *Lee v. Macon County Bd. of Educ.,* No. 604–E (M.D.Ala., October 23, 1969).

Pursuant to these directions, the Geneva County Board of Education ("Board") prepared a plan for the Geneva County School System, filed 15 January, 1970. (Bd. Ex. "II", "JJ")

On February 13, 1970, the three-judge court approved the plan submitted by the Board, and was of the opinion that the plan as filed by the Board and modified and supplemented by the three-judge panel would completely and effectively disestablish the dual school system previously operated by the Board. (Bd. Ex. "JJ", p. 2).

Since 1970, there has been no determination made by this Court (or by the predecessor three-judge court in *Lee v. Macon County)* that the Geneva County plan, as implemented, has succeeded in eliminating all vestiges of the former dual system, and the Board remains subject to the continuing jurisdiction of this Court. *See Lee v. Macon County Bd. of Educ.,* No. 844–E.

The Geneva County School System currently consists of schools located at Slocomb, Samson, Hartford, and Coffee Springs. Coffee Springs is the smallest by far.

On December 17, 1994, a fire completely destroyed the main structure at Coffee Springs High School. A facility survey conducted by the State Department of Education evaluated buildings, sites, and enrollment trends in the attendance areas for three of the four high schools in the Geneva County School System—Coffee Springs, Samson (to the west), and Hartford (to the east).

The Alabama State Department of Education has established certain standards regarding approved school centers, including standards relating to minimum student enrollment. For a K–12 school such as Coffee Springs, the State's standards require enrollment of at least 490 students and recommend between 500 and 550. (Bd. Ex. "W"; Test. of R.E. Higginbotham).

The State Department of Education conducted an assessment and survey of the Geneva County School in January/February 1995. Following the Department's work, a written report was presented to the Board (Bd.Ex. "W"). The report noted that capital outlay funds should be expended at school centers where the facilities will be utilized for many years, and that a newly constructed building is expected to remain in use for 40–50 years. The report further noted that the Department of Education Administrative Code states "... that all new construction of school facilities shall take place only at approved school centers and ... all construction shall have the written approval of the State Department of Education." (Bd. Ex. "W" at i). Because new construction would be required at Coffee Springs to replace the buildings destroyed by fire, the Department recommended that no new buildings be erected at the Coffee Springs site, and that beginning with the 1995–96 school term, all pupils in grades 6–12 at Coffee Springs be transferred to approved centers in Samson and Hartford.

The State Department survey team recommended that Coffee Springs School be reorganized for students in grades K through 5 exclusively, who could be housed in the permanent facilities remaining at Coffee Springs

School without additional construction. Because the existing enrollment in grades 7 through 12 at Coffee Springs High School did not meet minimum State Board of Education standards for an approved junior and senior high school center, the survey staff recommended the relocation of all sixth through twelfth grade Coffee Springs students to the approved school sites at Samson and Hartford. The County Superintendent of Education, Dr. Faulk, also made that recommendation to the Board. The recommendation was adopted by the Board on March 14, 1995, and is the subject of the pending litigation in this court.

Although according to the testimony of members of the Board and the County Superintendent of Education, the recommended transfer of the sixth through twelfth grades would not have been proposed at the present time in the absence of the fire, some 35 years ago (in 1959) the State Department of Education found that the enrollment level at Coffee Springs did not meet minimum standards for any grade structure. At that time, the site was approved only for temporary use. Later, in 1971, Coffee Springs received State Department of Education approval as a permanent elementary school, but only as a temporary center for grades 7 through 12. In 1980, the Department of Education found that the enrollment in grades 9 through 12 was too small to justify the continued operation of a high school and, further, that the course offerings were too limited and the cost per pupil too great for an economically and educationally sound operation. Accordingly, in 1980 and again in 1990, it was recommended that all Coffee Springs students in grades 9 through 12 be transferred.

In 1995, in the wake of the fire, the State of Education Department recommended that the allocation of funds to be received from the Risk Management Division of the State Department of Education for the destroyed buildings at Coffee Springs be used to construct new classrooms at Samson and Hartford to accommodate middle school students on both campuses, including those presently proposed for transfer from Coffee Springs, which would thereafter afford modern school facilities to all such students.[1]

Prior to seeking Court approval to close part of Coffee Springs School, the Board met with the public in two sessions—one to receive the report from the State Department of Education, and one to hear concerns, answer questions, and exchange information.

On March 15, 1995, the Board filed the pending petition seeking approval from this Court to relocate Coffee Springs School grades 6–12 to approved school centers in Hartford and Samson, effective with the beginning of the 1995–96 school term. The proposed boundary line for the transfer of students was based on student residences east and west of Alabama State Highway 27.

Historically, the Coffee Springs School functioned as a school for white students under the former dual system. The most recent student attendance data for the 1994–1995 school year reveals an enrollment in grades 6–12 at the Coffee Springs School of 171 students, of which 31 are black students (constituting 18% of the student body) and 140 are white students (constituting 82% of the student body). (Bd. Ex. B).

In the Geneva County School District as a whole, there are 1,520 students enrolled in grades 6–12; of these, 1,243 are white students (constituting 81% of the total enrollment), and 264 are black students (constituting 18% of the total enrollment).[2] (Bd. Ex. B).

The most recent enrollment data reveals an enrollment in grades 6–12 at the Hartford schools of 400 students, of which 309 are white students (constituting 77% of the student body) and 91 are black students (constituting 23% of the student body). (Bd. Ex. B).

The most recent enrollment data reveals an enrollment in grades 6–12 at the Samson schools of 427 students, of which 348 are white students (constituting 82% of the stu-

1. The present petition does not ask approval for this use of funds. A denial of the petition, however, would have the effect of compelling the use of the funds for constructing a new facility at Coffee Springs.

2. There are thirteen students who are listed as either Hispanic, Asian–American, or American Indian and who make up the missing 1%.

dent body) and 75 are black students (constituting 18% of the student body). There are 3 Hispanic students and 1 American Indian enrolled as well. (Bd. Ex. B).

The most recent enrollment data reveals an enrollment in grades 6–12 at the Slocomb schools of 522 students, of which 446 are white students (constituting 85% of the student body) and 67 are black students (constituting 13% of the student body). There are 9 hispanic students and 1 Asian student enrolled at Slocomb. (Bd. Ex. B).

According to the school district's projections, there will be 135 students from the Coffee Springs School that will be relocated under the proposed consolidation; of these, 22 will be black students and 113 will be white students. 85 white students and 7 black students from the Coffee Springs School will be relocated to the Samson schools. 28 white students and 15 black students will be relocated to the Hartford schools. Therefore, of the students being relocated under the Board's proposed consolidation, 84% are white and 16% are black. (Bd. Ex. H).

As a result of the transfer of students from Coffee Springs, the Samson schools are expected to have an enrollment in grades 6–12 of 531 students, of which 442 will be white (constituting 83% of the student body) and 89 will be black (constituting 17% of the student body), and the Hartford schools are expected to have an enrollment in grades 6–12 of 463 students, of which 355 will be white (constituting 77% of the student body) and 108 will be black (constituting 23% of the student body).

For the students involved in the relocation, they will go from attending the Coffee Springs School with a student enrollment that is 18% black to schools in Samson and Hartford with student enrollments that are 17% black and 23% black respectively.

As a result of the consolidation, the racial composition of the student enrollments at Samson and Hartford will experience no significant change. The racial composition of the Samson schools' student enrollment at grades 6–12 will go from 18% black to 17% black; likewise, the racial composition of the student enrollment at the Hartford schools will remain at 23% black.

In terms of the distribution of the burdens that inevitably are placed on students who are relocated from one school to another, the evidence clearly demonstrates that these burdens will fall disproportionately upon white students. Of the students being relocated, the overwhelming majority are white (113 out of 135, or 84%). Some of the relocated students will have to be transported by bus to attend their new school when they once walked to the Coffee Springs School, and many who are already transported to the Coffee Springs School will be transported greater distances to reach their new schools. In each case, however, the vast majority of the students so affected are white students.

Testimony from Dr. Byas and Ms. Lambert established that approximately 90% of the black Coffee Springs students and 50% to 60% of the white Coffee Springs students are economically disadvantaged as indicated by their participation in the free or reduced-cost breakfast programs at the school. Based on this data, their testimony further confirms that, of the 113 white and 22 black students who would be relocated under the Board's proposed consolidation, one may expect approximately 57 to 68 white students and 20 black students to be economically disadvantaged. Therefore, should economically disadvantaged students be impacted more negatively by the relocation, there are approximately three times as many whites as blacks whom one would expect to be economically disadvantaged and negatively impacted by the consolidation.

In regard to the racial composition of the teachers and staff at the schools in the Geneva County School District, the closing of Coffee Springs School and the reassignment of its faculty will have a *de minimis* effect upon the receiving schools in the District because there are only 2 black teachers in grades 6–12 who will be relocated under the proposed consolidation.

In regard to extra-curricular activities, evidence was presented supporting opposing conclusions about whether the relocation would enhance or diminish the opportunities available to Coffee Springs students involved in the relocation. In any case, there was no

evidence that more black students would be affected by the change than whites; on the contrary, the evidence clearly established that even in regard to economically disadvantaged students who might have diminished access to after-school activities because of transportation concerns, one would expect approximately three times more economically disadvantaged whites to be involved in the relocation than economically disadvantaged blacks.

Dr. Faulk testified that it was her opinion as Superintendent that, in making her recommendation to the Board, to close grades 6–12 at Coffee Springs and consolidate those students at Samson and Hartford would provide educational benefits to all Geneva County students, increase extra-curricular offerings and student activities, and provide better use of facilities. Dr. Faulk testified that prior to making her recommendation, she considered the fact that in her opinion educational opportunities would be greater for students from Coffee Springs when consolidated with students from Samson and Hartford; that economics dictated the closing of grades 6–12, because the Board spends more money per pupil for teacher salaries at Coffee Springs than at other schools due to its small enrollment; that the student enrollment at Coffee Springs was below the minimum standard called for by the State Department of Education for a K–12 school; that the consolidation would not have an adverse impact on the terminal desegregation order and the attainment of unitary status by the Board; that transportation of students was considered, and that a study by her staff indicated that consolidation and the burden of transportation would not fall disproportionately on the black children. Dr. Faulk stated that the proposed routes to carry children formerly attending Coffee Springs to Hartford or Samson, when compared with other school bus routes in the system, would be no more on average than those of hundreds of other students transported to school each day across the county.

Dr. Faulk testified that she considered a proposal to alter attendance zone lines between Samson, Coffee Springs and Hartford

in order to move more students to Coffee Springs, but she rejected such a proposal because there were not enough students in the three communities to justify three schools—that increasing Coffee Springs' enrollment would decrease that of Hartford and Samson.

It is quite clear from the evidence that the Board's action in accepting the recommendations made to it and in asking for approval of the proposed consolidation was not motivated by racial reasons.

### Conclusions of Law

■ The Supreme Court has set forth a clear standard for assessing the request of a school district under a desegregation decree to close a school and reassign its students:

> ... it is the responsibility of local authorities and district courts to see to it that future school construction and abandonment are not used and do not serve to perpetuate or re-establish the dual system.

*Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 21, 91 S.Ct. 1267, 1278, 28 L.Ed.2d 554 (1971). Therefore, "the duty to desegregate is violated if a school board fails to consider or include the objective of desegregation in decisions regarding the construction and abandonment of school facilities." *Harris v. Crenshaw County Bd. of Educ.,* 968 F.2d 1090, 1095 (11th Cir.1992).[3]

■ The construction and abandonment of schools has the power "to perpetuate or reestablish the dual system" because, "when combined with one technique or another of student assignment, [it] will determine the racial composition of the student body in each school in the system." *Swann,* 402 U.S. at 20, 91 S.Ct. at 1278. In the process of disestablishing the dual system,

> The district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools.... [I]n a system with a history of segregation the need for remedial crite-

---

**3.** *But see Hull v. Quitman County Bd. of Educ.,* 1 F.3d 1450 (5th Cir.1993) (approving a school consolidation plan that did not impede desegre-

gation even though the school board failed explicitly to consider the effect of the school closure on desegregation).

ria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition. *Id.* at 26, 91 S.Ct. at 1281. Accordingly, the Supreme Court has stated that, in the process of disestablishing the dual system, a "critical beginning point is the degree of racial imbalance in the school district, that is to say a comparison of the proportion of majority to minority students in individual schools with the proportions of the races in the district as a whole." *Freeman v. Pitts,* 503 U.S. 467, 474, 112 S.Ct. 1430, 1437, 118 L.Ed.2d 108 (1992).

■ The decision to close a school and reassign its students serves to perpetuate or re-establish the dual system if it perpetuates or re-establishes schools that are substantially disproportionate in their racial composition; that is, schools that are substantially disproportionate in their majority to minority students when compared to the proportions of the races in the district as a whole. *Id.* Therefore, a school consolidation proposal that reinforces or creates schools with racial compositions that depart significantly from the district-wide average may be said to perpetuate or re-establish the prior dual system of education.

■ Accordingly, this court must assess whether the proposed consolidation threatens to perpetuate or re-establish schools with racial compositions that are substantially disproportionate when compared to the district-wide average. A deviation of fifteen or twenty percentage points beyond the district-wide average is a commonly accepted benchmark for determining whether individual schools are "substantially disproportionate in their racial composition." *See Stell v. Board of Educ. of City of Savannah,* 724 F.Supp. 1384, 1401 (S.D.Ga.1988), *aff'd,* 888 F.2d 82 (11th Cir.1989).

■ Beyond student assignment, the court must examine whether the proposed consolidation serves to perpetuate or re-establish the dual system in other areas of the school district's operations. As the Supreme Court has emphasized, all of "[t]he *Green [v. County School Bd. of New Kent County, Va.,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) ] factors [*i.e.,* faculty, staff, transportation, extra-curricular activities, and facilities] are a measure of the racial identifiability of schools." *Freeman,* 503 U.S. at 486, 112 S.Ct. at 1443. Therefore, the court must examine the proposed consolidation's impact on the *Green* factors of the school system to see if the consolidation serves to perpetuate or re-establish segregation in these areas. As the Supreme Court has stated,

[E]xisting policy and practice with regard to faculty, staff, transportation, extra-curricular activities, and facilities were among the most important indicia of a segregated system. [citation omitted] Independent of student assignment, where it is possible to identify a "white school" or a "Negro school" simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown.

*Swann,* 402 U.S. at 18, 91 S.Ct. at 1277.

■ Therefore, a critical element in the court's assessment of a proposed consolidation is the impact on the racial composition of the faculty and staff at the resulting schools. The closing of a school and reassignment of its teachers and staff may "serve to perpetuate or re-establish the dual system" because, "[i]ndependent of students assignment, where it is possible to identify a "white school" or a "Negro school" simply by reference to the racial composition of teachers and staff, ... a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown. *Swann,* 402 U.S. at 18, 91 S.Ct. at 1277.

■ Accordingly, school districts have been required to "maintain[ ] a ratio of black to white teachers and administrators in each school to approximate the ratio of black to white teachers and administrators throughout the system." *Freeman,* 503 U.S. at 481, 112 S.Ct. at 1441 (*citing Singleton v. Jackson Mun. Separate Sch. Dist.,* 419 F.2d 1211 (5th Cir.1969)).

Therefore, this Court must assess whether the consolidation threatens to reassign teach-

ers and staff in a manner that will necessarily create faculty race ratios in the resulting schools that do not approximate the ratio throughout the system. The court concludes that it does not.

 Apart from assessing whether the proposed consolidation serves to perpetuate or re-establish segregation, there are two additional factors that must be weighed by this court if the proposed consolidation involves closing a predominantly black school. First, as the Court of Appeals for the Eleventh Circuit recently held:

> [W]hen a school board proposes to close a school facility with a predominantly minority student body, it must "adduce evidence sufficient to support the conclusion that [its] actions were not in fact motivated by racial reasons."

*Harris,* 968 F.2d at 1095 (*quoting, Arvizu v. Waco Indep. Sch. Dist.,* 495 F.2d 499, 505 (5th Cir.1974). Secondly, even if the closure of the majority black school is not racially motivated, and even if it does not perpetuate or re-establish segregation; nevertheless, the burden of the closure and relocation can not be disproportionately placed upon the minority students.

> To comply with constitutional mandates, the burden of desegregation must be distributed equitably; the burden may not be placed on one racial group.

*Id.* at 1097 (*quoting Arvizu,* 495 F.2d at 504; *Lee v. Macon County Bd. of Educ.,* 448 F.2d 746, 754 (5th Cir.1971)). The inquiry regarding disproportionate burdens is invoked in the closing of a predominantly minority school because more black students than white students must endure the burdens of relocation. *Arvizu,* 495 F.2d at 504.

In sum, therefore, if the school board proposes a modification of their desegregation order which involves the closing of a school and the reassignment of its students and faculty, such a petition may be approved if it does not serve to perpetuate or re-establish the dual school system, and if, in the case of a proposed closing of a school with a predominantly minority student body, the board is able to adduce evidence sufficient to support the conclusion that its actions were not in fact motivated by racial reasons and if minority students are not made to bear a dispro-

portionately greater share of the burdens of relocation.

 The court has considered the additional factors which are appropriate in cases involving the closing of predominately black schools, even though Coffee Springs does not fit that description. The Board's decision was in no way racially motivated, but was based on non-racial reasons related to what was considered to be the best use of limited educational funds for the benefit of the school children of Geneva County as a whole. Furthermore, minority students are not made to bear a disproportionately greater share of the burdens of relocation. The burdens affect black and white students alike, while affecting white students to a greater extent on the basis of number. So, even if these factors were appropriate for consideration, the evidence regarding them weighs in favor of the Board's position.

 Based on the substantial evidence in this case, the court finds that the Intervenors failed to demonstrate any meaningful interest in the subject matter of this suit—desegregation. It appears the Intervenors' clear interest is in preserving their neighborhood school. While this is an important and understandable interest on the part of the Intervenors, unless it is a matter that obstructs the establishment of a unitary school system, it is not a matter that should be taken from the decision-making process of the Board and placed in the hands of a federal court.

Intervenors claim that the proposed consolidation will result in three racially identifiable high schools in Geneva County, but there was no credible evidence to substantiate this claim presented at trial. Intervenors did not dispute the enrollment data of the Board that indicates the student enrollment at the two receiving high schools will be 17% minority at Samson and 24% minority at Hartford. The black/white ratio in the Board-operated schools in Geneva County is 17% black/1% other/82% white, and there is no standard from federal desegregation law by which such schools would be considered racially identifiable in their student enrollments. Neither will the transfer of two black teachers have any effect on the racial identifiability of the schools to which they are

transferred. There is absolutely nothing about the Board's proposal which will make any of the schools identifiable as a "white school" or a "black school." The court rejects this contention of the Intervenors and agrees with the Board and the United States that the evidence refutes this. The court concludes that the Board's proposal will in no way serve to perpetuate or re-establish the dual system.

The court has expressed concern that the present petition does not address whether the Geneva County School System has finally achieved unitary status, and the evidence was without dispute that the attendance zones proposed under the Board's original plan and established by the court's 1970 terminal order have not been strictly enforced. The Board has proposed that this matter be addressed in separate proceedings and through counsel has recommitted itself to the responsibility of assuring that its system is unitary. The court will accept that approach and will enter a separate order in that regard. If the system is now legally unitary, it should be so declared by the court. If it is not, after twenty-five years of being under a federal court order, it is time for the Board to do what is necessary to finally achieve that status, all to the end that full control of a constitutional public school system in Geneva County may be returned to local authorities where it belongs.

### Conclusion

Because of a fire which destroyed a school building, the Geneva County Board of Education was faced with a hard decision: whether to build a new school in Coffee Springs and thereby commit scarce education funds for many years in the future to maintaining a fourth small school in the county for grades 6–12, or whether to consolidate those grades with two of the three other existing schools. A hard decision about which citizens, parents, and students could, and did, strongly disagree. But, a decision which should be made by local school authorities, not by a federal court, *unless* the local decision serves to perpetuate or re-establish the racially segregated dual school system. The court having found that the closing of Coffee Springs grades 6–12 does not serve that pur-

pose, the petition of the Geneva County Board of Education is due to be GRANTED.

### Order

In accordance with the findings of fact and conclusions of law set out above, the Petition On Behalf Of Geneva County Board of Education For Permission To Relocate Coffee Springs Grades 6–12 Students is GRANTED, and it is hereby ORDERED as follows:

(1) Permission is granted to relocate grades 6–12 of Coffee Springs School, beginning with the 1995–96 school year, with students residing west of Highway 27 North from Geneva to the Coffee County line to be assigned to Samson and students residing east of Highway 27 North from Geneva to the Coffee County line to be assigned to Hartford.

(2) Alexander Kato, et al., Plaintiffs–Intervenors under order of the court entered on May 3, 1995, are dismissed as parties to this action.

(3) The court retains jurisdiction for continued supervision of the Geneva County School System until such time as the system can be declared unitary, with all vestiges of the racially segregated dual school system dismantled, and control returned fully to local authorities.