Anthony T. LEE, et al., Plaintiffs,

v.

UNITED STATES of America, Plaintiff–Intervenor and Amicus Curiae.

NATIONAL EDUCATION ASSOCIATION, INC., Plaintiff–Intervenor,

v.

MACON COUNTY BOARD OF EDUCATION, et al., Defendants.

Civil Action No. 70–0251.

United States District Court, N.D. Alabama, Southern Division.

Jan. 10, 1996.

Solomon Seay, Jr., Montgomery, AL, for Anthony T. Lee, Nat. Educ. Ass'n, Inc., J. Celeste Holt, John E. Williams.

Janell M. Byrd, New York City.

Caryl P. Privett, Asst. U.S. Atty., Birmingham, AL, William B. Reynolds, John R. Moore, Pauline A. Miller, Civil Rights Div./Dept. of Justice, Washington, AL, for U.S.

Norman J. Chackhin, Dennis Wade, Dennis D. Parker, NAACP Legal Defense & Ed. Fund, Inc., New York City, Cassandra Q.

Butts, NAACP Legal Defense & Ed. Fund, Inc., Washington, DC.

J. Russell Gibson, III, Phelps, Owens, Jenkins, Gibson & Fowler, Tuscaloosa, AL.

## MEMORANDUM OPINION

BLACKBURN, District Judge.

This cause is before the court on plaintiffs' Motion for Specific Relief and Motions for Temporary Restraining Order and Preliminary Injunction and the defendants' Motion for Emergency Hearing and Petition for Approval of Construction.[1] At this point the only issues to be resolved are whether the court should issue an order requiring the Tuscaloosa City Board of Education ("the Board") to undertake a comprehensive review of properties available for new school construction, or alternatively, whether the court should approve the current facilities Plan as proposed by the Board.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based on the testimony and the exhibits offered into evidence, the court finds and concludes:

1. The City of Tuscaloosa's elementary schools are substantially overcrowded. During the 1994–95 school year the school district lacked the capacity to house approximately 20% of the district's students, using over 60 portable classrooms to compensate for the lack of permanent space. The school with the most severe overcrowding problems was Verner Elementary School, the only elementary school located north of the Black Warrior River.

2. University Place Elementary School is in such poor condition as to be beyond repair.

3. The Board recognized these problems and, because the Board is under a federal court order, advised private plaintiffs ("plaintiffs"), represented by the NAACP Legal

Defense Fund ("Legal Defense Fund"), and the United States Department of Justice ("United States") of the need to replace University Place Elementary School, as well as construct a new school.

4. The United States and the Legal Defense Fund suggested that the Board undertake comprehensive planning to establish exact needs and to examine options for meeting those needs. In addition, the United States offered to provide a school planning expert to assist in the development of this planning process, and the Board accepted this offer.

5. In November of 1991 the Board was deeded a parcel of land by the City of Tuscaloosa for the purpose of building a school on the parcel. The deed of transfer contained a restriction providing that if the Board did not use the parcel for the construction of a new elementary school within 48 months, the property would, at the City's option, revert back to the City of Tuscaloosa. The 48-month time period elapsed in November of 1995.

There is no evidence suggesting that the Board had input with regard to the location of that property or that the City considered the effect a school at that site would have on desegregation when they executed the deed. According to Allen Henry, a Board member who was actively involved in site selection, the City gave the land to the Board in lieu of money owed to the schools by the state.

6. In August of 1993, the Board initiated a planning process to determine how to relieve overcrowding problems in the City of Tuscaloosa's elementary schools. The planning process used by the Board was implemented pursuant to extensive guidelines recommended by the planning expert, Mr. Kelley Carey, provided by the United States. Initially, Mr. Carey worked closely with members of the Board in developing a planning process that would ensure consideration of a multiplicity of factors, including facilities needs, desegregation, population trends,

---

1. Defendants initially filed a Petition for Approval of Construction/Remodeling at University Place Elementary School and for Construction of Elementary School To Relieve Overcrowding at Verner Elementary School. Plaintiffs then filed a Motion for Specific Relief and Motions for Temporary Restraining Order and Preliminary Injunction. Finally, defendants filed a Motion for Emergency Hearing. Because the court held a hearing to address the issues in defendants' petition and in plaintiffs' motions, defendants' Motion for Emergency Hearing is moot.

community concerns, and educational needs. Although neither the United States nor Mr. Carey agreed with the initial planning process or the early plan, both agree that the current plan resulted from a comprehensive study and will further desegregate Tuscaloosa City Schools.

7. The planning process began with an extensive review of the school district's current facilities. The Board hired a group of architects to consider each school and to report on the needs for renovation, the suitability for expansion, and the projected life expectancy of the current buildings.

8. The planning process continued with an extensive study of student demographics. The Board studied not only where students are presently attending school, but also how many students are attending schools out of their attendance zones to which they have not officially been transferred.

11. The Board then instituted a computerized mapping system that plotted the location of each student and indicated the race of each student, enabling the Board to discern where students were living, how many students should be attending each school, and what the racial make-up of each school should be based on current attendance zones. *See Harris v. Crenshaw County Bd. Of Educ.*, 968 F.2d 1090, 1094 (11th Cir.1992) (defendant Board conducted similar analysis); *Adams v. Board of Pub. Educ.*, 770 F.2d 1562, 1565 (11th Cir.1985) (approving plan after Board examined attendance figures, organizational structure, size of schools, racial composition of schools, finances, and the physical condition and location of the schools).

12. As a result of this analysis, the Board developed a new student transfer policy to ensure that the Board knows where each student is attending school. All parties have agreed to the new transfer policy.

13. The Board also conducted a study of educational programs to ensure the delivery of a sound educational model to all students. As a result of this study, the Board developed a plan to work toward implementing magnet programs at several of its elementary schools:

A magnet is an educational program which, in addition to a basic curriculum, offers an additional highly specialized curriculum centered on a theme. Such a program is designed to meet the needs of children as well as providing an added attraction that will draw students from around the school district.

*Stell v. Savannah–Chatham County Bd. Of Educ.*, 888 F.2d 82, 83 (11th Cir.1989).

14. During the 1994–95 school year, the Board operated a magnet program at Central Elementary School. This program has been successful in desegregating a previously racially isolated school. All parties have agreed to the continuation of the magnet program at Central Elementary School and to the implementation of two new magnet programs at University Place Elementary School and Stafford Elementary School.

15. Pursuant to its plan to work toward implementing magnet school programs at several of its schools, the Board applied for and became the recommended recipient of a grant under the Magnet Schools Assistance Program. The designation of the specific site for the placement of the third new magnet program is required to resolve eligibility questions about the Board's grant application.

16. The Board also consulted with a city planner to determine which areas of the city were growing at the fastest rate. The city planner indicated that most of the current growth was occurring in the north part of the city to the north of the Black Warrior River. According to the latest census information, the population around the proposed site for a new school named "Rock Quarry" grew from approximately 3,200 in 1980 to over 14,500 in 1990. In contrast, the population around Valley View, another site considered by the Board, declined during that same time from approximately 15,300 to 12,700. Also during that time, the City of Tuscaloosa issued 1,538 building permits in the Rock Quarry area and only 274 in the Valley View area.

17. In developing its Plan, the Board searched for suitable land on which a new school could be constructed. *See Swann v. Charlotte–Mecklenburg Bd. Of Educ.*, 402

U.S. 1, 20, 91 S.Ct. 1267, 1278, 28 L.Ed.2d 554 (1971) (question of location of new school must be decided in light of population growth, finances, land values, and site availability); *see also United States v. Hendry County Sch. Dist.*, 504 F.2d 550, 552 (5th Cir.1974) (affirming district court's consideration of site availability, land values, population growth, racial composition of neighborhood, and transportation requirements in assessing proposed location of new school). State regulations require a ten-acre site of land for the size school needed. The Board found several appropriate parcels of land south of the Black Warrior River, but they were owned by the University of Alabama and the Alabama Department of Mental Health and were not for sale. Mr. Henry also testified that a parcel of property known as the Queen City Park site just south of the river may have been available. However, a city referendum in 1987 rejected that site as the location of a new middle school. Therefore, the Board concluded that popular opinion was against the use of that particular site. In addition, no land north of the Black Warrior River was available south of Verner Elementary School. The Board owns a suitable parcel of property adjacent to Verner Elementary School. However, the Board determined that this site was inappropriate because of the number of children that would attend school in the same location. The Board also considered property owned by the Alabama Department of Mental Health north of the Rock Quarry site, but because this property is further north than Rock Quarry, the Board concluded that it was not as suitable for the construction of a new school. Therefore, the Board found only one parcel of suitable land available, the parcel designated as Rock Quarry.

18. The review and planning processes culminated in a Plan that includes the replacement of the current University Place Elementary School with a new magnet school located on the same site; the construction of a new magnet school to be located at Rock Quarry in northeast Tuscaloosa; the continuation of the magnet program at Central Elementary School; and the implementation of a magnet program at Stafford Elementary School. The Plan also includes a new configuration of attendance zones to encompass the new school; the implementation of a new transfer policy; the renovation of Stillman Heights Elementary School; and the continued examination of overcrowding problems or potential growth elsewhere in the district.

19. In modifying the current attendance zones and developing the magnet school programs, the Board examined the burden of transportation on both black and white children, as well as the burden of displacement from their current schools. *See Cisneros v. Corpus Christi Indep. Sch. Dist.*, 467 F.2d 142, 153 (5th Cir.1972) (length and time of travel for students must be considered in assessing plan). In conducting its analysis, the Board calculated the distance and time required for all students to travel to attend the school in their zone and compared the burden based on time and distance between white and non-white students. The Board also included a computation of the time and distance students participating in the magnet programs will travel. The Board concluded that with regard to the magnet program, 62% of the burden calculated by distance will be on non-black students, while 64% of the burden calculated by time will be on non-black students.

The Board did not, however, rely solely on statistical studies in determining the effect of its Plan on transportation burdens. It also used its knowledge of the city and existing traffic patterns to evaluate the transportation burden. For example, the Board concluded based on existing traffic patterns that it would be difficult to transport students from the Rock Quarry area south across the Black Warrior River in the morning and north back to their homes in the afternoon, given the congestion already caused by rush hour traffic. The congestion on the bridges, in particular, presents both a safety hazard and a risk of late arrival. After examining the Board's burden analysis, the United States is satisfied that the Plan reasonably allocates any burdens of transportation required by implementation of the Plan.

Plaintiffs contend that the Board's analysis of the transportation burden is flawed.

Plaintiffs argue that transportation is not a burden if a student voluntarily chooses to attend a magnet program at a school that is not the closest school or if a student chooses to make a majority to minority transfer that results in further travel. Therefore, plaintiffs would exclude from the burden analysis all of those students voluntarily choosing to travel to attend a magnet program or because of a majority to minority transfer.

Plaintiffs further contend that implementation of the proposed plan will substantially increase the transportation burden on black children. According to plaintiffs, 450 black children live over two miles from the majority white school they are zoned to attend under the Board's plan, as compared to 289 under the existing zones. Therefore, the Board's plan places an additional transportation burden on 161 black students who are involuntarily zoned to attend schools at a distance of more than two miles for desegregation purposes. Plaintiffs also note that for black children from the predominantly black schools to attend the magnet program at Rock Quarry, the distance is longer and the time greater than for the white children in the most distant majority white schools to attend a magnet program at a majority black school.

■■■ Although plaintiffs' critique of the Board's analysis provides an alternative method of calculating the burden of transportation, at all times the Board *made an effort* to distribute the burden of desegregation equitably among children of all races. *See Harris,* 968 F.2d at 1097 (duty to desegregate is violated if school board fails to consider or include objective of desegregation in decisions involving construction of school facilities); *see also Hendry County,* 504 F.2d at 554 (affirming decision to construct new school after considering similar factors). In addition, while the court recognizes that there are other ways of calculating burden, the court agrees with the Board that its Plan distributes the burden of desegregation equitably. The purpose of the court's review is not to substitute its judgment for the school board's, but rather to ensure that the Board has considered the effect of its desegregation plan on minority students and has attempted to distribute that burden equitably. In this case, the Board has shown the court that it has complied with both of these requirements. *See Milliken v. Bradley,* 433 U.S. 267, 281, 97 S.Ct. 2749, 2757–58, 53 L.Ed.2d 745 (1977) (school authorities have primary responsibility for "elucidating, assessing, and solving these problems"); *Lee v. Anniston City Sch. Sys.,* 737 F.2d 952, 955 (11th Cir. 1984) (the interests of the state and local authorities in managing their own affairs, consistent with the Constitution, must be considered in reviewing a proposed remedy). The Board calculated the time and distance each student would have to travel under its Plan, compared the burden on white and on non-white students, and ensured that the burden of desegregation across the entire system is distributed equitably.

20. The Board worked extensively to ensure that the Rock Quarry Elementary School will be racially diverse. Although most of the growth in the Rock Quarry area has been in the white population, the proposed zone for Rock Quarry, which will be carved from the existing Verner zone, will have a black population of 23%, while leaving the remaining Verner zone with a black population of 44%. In addition, the Board modified its plan several times in order to achieve its projected 50/50 ratio of white to black students at Rock Quarry. *See Stell,* 888 F.2d at 83 (defendant school board had goal of 50/50 ratio in traditionally black school). Far from "lock[ing] the school system into the mold of separation of the races," *Swann,* 402 U.S. at 21, the inclusion of a magnet program at the proposed Rock Quarry Elementary School was part of the Board's effort to ensure a racially integrated school. *See Stell,* 888 F.2d at 83–84.

Plaintiffs assert that the Board's proposed school zones would rezone to the proposed Rock Quarry School approximately 82 white students in neighborhoods south of the river even though these students live less than two miles away from several majority black schools south of the river. Plaintiffs, therefore, dispute the contention that the Board made a good faith effort to draw zone lines that would further desegregate Tuscaloosa City Schools.

Plaintiffs also contend that the 50/50 attendance goal is unfair to black students, since black students comprise 65% of the population in Tuscaloosa City Schools. However, although it may be ideal if all schools could be 65/35, the evidence indicates that the Board's plan will further desegregate *all* of the schools. In addition, although plaintiffs' alternative "proposal" [2] might more effectively desegregate certain schools, there is no evidence that it would more effectively desegregate the system as a whole. A central characteristic of the Board's Plan is its comprehensive nature. That is, the Plan was developed to address the needs of, and to further desegregate, the system *as a whole,* not one particular school or group of schools within the system. By contrast, plaintiffs' critiques focus on particular parts of the Plan without addressing the effect of the Plan as a whole on desegregation.

21. The Board has made every effort to ensure that children of all races in Tuscaloosa will have the opportunity to take advantage of the magnet programs outlined in the Board's Plan. As the district court found in the *Stell* case, "the school board appears here to be fully committed to the success of this plan and to making adjustments from time to time to make it so." *Stell v. Savannah–Chatham County Bd. Of Educ.,* 888 F.2d 82, 84 (11th Cir.1989). The court notes that three of the four magnet schools will be located in predominantly black neighborhoods. *See id.* at 83 (magnet programs located in predominantly black schools).

However, the Plan does not include open enrollment at the magnet schools. Rather, under the Plan, a student can only voluntarily choose to attend a magnet school if his or her attendance at that school will contribute to its desegregation. Thus, only black students who are zoned for the three magnet programs at black schools can attend those schools. All other black students in the City must compete for the magnet program at

Rock Quarry. On the other hand, white students not zoned for Rock Quarry will have the opportunity to attend any one of the three magnet programs located in predominantly black schools. Plaintiffs argue that this Plan is unfair to black children because while three of the four magnet programs will be located in predominantly black schools, all other black students will have to compete to go to the only magnet program located at a predominantly white school. Meanwhile, although only one magnet program is located in a predominantly white school, white students not zoned for Rock Quarry will have the opportunity to apply for all three of the magnet programs located in the predominantly black schools. The Board responds that it placed three of the four magnet programs at majority black schools in order to attract white students to those schools and to desegregate them.

The magnet program at Central Elementary School has successfully desegregated a school that all parties agreed could not practicably be further desegregated under the 1981 consent decree. Although plaintiffs' suggestion that the magnet programs be open to all students *may* be a viable solution, plaintiffs have presented no evidence indicating that the Board's plan will not further desegregate the schools.[3] By contrast, the Board has presented evidence indicating that the further desegregation of its school system was a primary consideration in developing its Plan, including its attendance zones and the structure of its magnet programs.

The risk of resegregation under the Plan arises mainly from the possibility that the magnet programs will fail to attract the number of students anticipated. The Board's Plan adequately addresses this risk. The Board proposes an extensive and continuous publicity campaign to develop interest in the magnet programs. The campaign includes the assignment of a Board employee to work

---

**2.** The private plaintiffs, through the testimony of their expert, Dr. Michael Stolee, questioned the accuracy of the Board's statistics, criticized the Board's Plan, and described *some* alternatives to the Plan. However, private plaintiffs did not present a complete alternative to the court.

**3.** The court also notes that the plaintiffs presented no analysis of the impact on desegregation efforts of their proposal that magnet schools be open to all students in the district, even though it appears that numerous students would be displaced if the magnet program operated in that manner.

full time as a community liaison and an annual evaluation of enrollment in the programs. As noted, the Board successfully implemented a magnet program at Central Elementary School in the 1993–1994 school year.

22. In developing its Plan, the Board considered several alternatives. Although plaintiffs argue that the Board's Plan is unfair to black children, no other party to this case presented the Board with a complete alternative plan. Plaintiffs' expert, Dr. Michael Stolee, presented the court with some alternative suggestions. However, he emphasized that his were merely suggestions; he did not consider his suggestions to constitute a complete alternative plan. On the other hand, the Board has supplied the bases for its conclusions and a complete record of its decision-making process. *See Bradley v. School Bd. Of City of Richmond, Va.*, 324 F.Supp. 456, 467 (E.D.Va.1971) (effective review requires that the bases for administrators' conclusions be supplied).

■ Under *Green v. County School Bd. of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the district court has an obligation to consider the reality of the school system "in light of any alternatives which may be shown as feasible and more promising in their effectiveness." *Id.* at 439, 88 S.Ct. at 1695. In this case, there is no evidence suggesting that the alternative suggestions provided by plaintiffs via Dr. Stolee would be more effective at desegregating the system as a whole. In addition, despite the fact that plaintiffs have had over two years to suggest an alternative plan to the court, Dr. Stolee himself declined to characterize his suggestions or proposal as a "complete plan" ready for consideration as an alternative to the Board's plan. Of course, the burden is on the Board to prove to the court that its location of a new school "do[es] not serve to perpetuate or re-establish the dual system." *Swann*, 402 U.S. at 21, 91 S.Ct. at 1278–79. Nevertheless, the Board has met its burden, and plaintiffs have not provided an alternative plan that has been shown to be more effective than the Board's.

23. The court recognizes that there is opposition from some members of the plaintiff class to parts of the Board's Plan, particularly to the construction of the new school at Rock Quarry.[4] However, in developing the Plan, the Board held several public meetings to listen to community members' concerns. In particular, the Board decided against closing Oakdale Elementary School in response to community support for keeping the school open, despite its small size and relatively high cost. Although several members of the black community testified that their point of view had been ignored or that it appeared that the Board had decided long before the "planning process" what action would eventually result from the process, the Board has provided ample evidence that it acted in good faith in undertaking the planning process and gave the community sufficient opportunity to respond to the Board's plans.

24. The Board considered the effects on desegregation in developing its Plan, and further desegregation was part of the purpose of the Plan. Indeed, "the primary purpose of the magnet program as designed for this desegregation plan is to draw white students to the almost exclusively black city schools [and to draw black students to what would otherwise become a predominantly white school in Rock Quarry] in substantial enough numbers to desegregate those schools." *Stell*, 888 F.2d at 85. Therefore, unlike the defendant school board in *Mills v. Polk County Bd. Of Public Instruction*, 993 F.2d 1485, 1494 (11th Cir.1993), the Board in this case considered the objective of desegregation in deciding both where to locate the new school and the educational programs to implement in the new school.

25. In addition, the Board has acted in good faith in attempting to formulate a fair plan. *See Lee*, 737 F.2d at 955 (good faith is relevant factor in determining whether a court abused its discretion in adopting the school board's proposed plan); *see also Hull v. Quitman County Bd. Of Educ.*, 1 F.3d 1450, 1454 (5th Cir.1993) (good faith pertinent to determining whether particular school board action comports with goals of desegregation decree); *Dowell v. Bd. Of Educ. Of Okla. City Public Sch.*, 8 F.3d 1501, 1511–13 (10th

---

4. The court notes, however, that there was also testimony in support of the Plan.

Cir.1993) (" 'specific policies, decisions, and courses of action that extend into the future must be examined to assess the school system's good faith.' " (citation omitted)). The Board listened to the concerns of the other parties and the advice offered by the expert presented by the United States. When appropriate, it changed its plan based on that information. The massive amount of work performed by the Board in developing its plan is further evidence of the Board's desire to achieve a constitutionally acceptable plan.

School authorities have the primary responsibility for "elucidating, assessing and solving these problems." *Milliken*, 433 U.S. at 281, 97 S.Ct. at 2757. Ultimately, the goal is education:

"A school system should be designed to attract motivated students of all races if it is to provide quality education.... [T]he measure of a desegregation plan is its ultimate effectiveness. The type of plan employed is of little consequence so long as it effectively achieves the constitutionally required result that public schools be conducted on a unitary basis."

*Stell*, 888 F.2d at 85 (citations omitted). Further, the Board's duty does not "compel them to adopt the most desegregative alternative available." *Pitts v. Freeman*, 755 F.2d 1423, 1427 (11th Cir.1985). In this case, the Board has studied the existing facts and available options; it has proposed a realistic plan for new school construction and magnet programs that will enhance the district's desegregation efforts; and it has come up with a plan that fairly apportions the burden of desegregation and "prevent[s] a recurrence of the previous dual system." *Adams*, 770 F.2d at 1565. In short, the Board has satisfied its "affirmative duty to solve [its] overcrowding problem in such a way that it furthers desegregation and helps eliminate the effects of the previous dual school system." *Pitts*, 755 F.2d at 1427; *see also Green*, 391 U.S. at 437–38, 88 S.Ct. at 1693–94 (school board has affirmative duty to "take whatever steps ... necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch"). Therefore, the school system has fulfilled its constitutional duty. *See Harris*, 968 F.2d at 1095

("To fulfill [duty to eliminate the effects of its prior unconstitutional conduct], school officials are obligated not only to avoid any official action that has the effect of perpetuating or reestablishing a dual school system, but also to render decisions that further desegregation and help to eliminate the effects of the previous dual school system.").

## CONCLUSION

Based on the foregoing, the court finds that the Board has conducted a comprehensive review of properties available for new school construction, rendering further study unnecessary. The court approves the implementation of the current Plan by the Tuscaloosa City Board of Education, including the construction of a new school at Rock Quarry; the implementation of magnet programs at University Place, Stafford, and Rock Quarry elementary schools; and the continuation of the magnet program at Central Elementary School.

An order granting defendants' Petition for Approval of Construction and denying plaintiffs' Motion for Specific Relief and Motions for Temporary Restraining Order and Preliminary Injunction will be entered contemporaneously herewith.